**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | |
|---|---|
| BEECHER COTTON, PAMELA COLON, SIRDINA ISAAC-JOSEPH, ESTHER CLIFFORD, SYLVIA BROWNE, ALVINA JEAN-MARIE ILARRAZA, RYAN ALLEYNE, AGNES AUGUSTUS, and CESARINA MIRANDA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LIMETREE BAY VENTURES, LLC, LIMETREE BAY HOLDINGS, LLC, LIMETREE BAY REFINING, LLC, LBR LIQUIDATING TRUST, DAVID M. DUNN, LIMETREE BAY TERMINALS, LLC, DBA OCEAN POINT TERMINALS, ARCLIGHT CAPITAL PARTNERS, LLC, FREEPOINT COMMODITIES, LLC, EIG GLOBAL ENERGY PARTNERS, LLC, BP PRODUCTS NORTH AMERICA, INC., UNIVERSAL PLANT SERVICES, (VI), LLC, EXCEL CONSTRUCTION & MAINTENANCE VI, INC., ELITE TURNAROUND SPECIALISTS, LTD., PINNACLE SERVICES LLC, VERSA INTEGRITY GROUP, INC., NATIONAL INDUSTRIAL SERVICES, LLC, and JOHN DOES 1-100, <br><br> Defendants. | No. 1:21-cv-00261-WAL-EAH <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **ACTION FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Beecher Cotton, Pamela Colon, Sirdina Isaac-Joseph, Esther Clifford, Sylvia

Browne, Alvina Jean-Marie Ilarraza, Ryan Alleyne, Agnes Augustus, and Cesarina Miranda

(collectively, "Plaintiffs"), individually and on behalf of all others similarly situated as defined

below (the "Class"), bring this First Amended Class Action Complaint for damages suffered by

Plaintiffs and the Class, against Defendants Limetree Bay Ventures, LLC, Limetree Bay Holdings,

LLC, Limetree Bay Refining, LLC, LBR Liquidating Trust, David M. Dunn, Limetree Bay Terminals, LLC dba Ocean Point Terminals (collectively, the "Limetree Defendants"), Arclight Capital Partners, LLC, Freepoint Commodities, LLC, EIG Global Energy Partners, LLC, BP Products North America, Inc., Universal Plant Services, (VI), LLC, Excel Construction & Maintenance VI, Inc., Elite Turnaround Specialists, Ltd., Pinnacle Services LLC, Versa Integrity Group, Inc., National Industrial Services, LLC, and John Does 1-100 (collectively, all named defendants are referred to herein as "Defendants"), as well as for injunctive and declaratory relief, for violations of law as set forth in detail below. The allegations set forth herein are based on each Plaintiff's personal knowledge as to the allegations pertaining to himself/herself, and upon information, belief, and investigation by counsel as to all other matters.

## I.  <u>INTRODUCTION</u>

1.     This case is about the emission, release, and discharge on multiple occasions of hazardous and toxic chemicals, substances, gases, and odors, including, without limitation, oil, hydrogen sulfide, sulfur dioxide, polycyclic aromatic hydrocarbons including naphthalenes, other petroleum hydrocarbons, and other chemicals, toxins, and particulates (collectively, the "Toxic Contaminants") from the Limetree Bay Refinery which is now the Port Hamilton Refining and Transportation and  West Indian Petroleum Ltd refinery located on St. Croix, U.S. Virgin Islands (the "Refinery") from February 2021 until the present.

2.     Specifically, on February 1, 2021, Defendants restarted the long-dormant 55-year-old refinery.  In doing so, Defendants negligently and recklessly ignored critically necessary improvements, and sought to avoid millions of dollars in environmental safeguards to save money and get the Refinery back in operation at the expense of the health, safety, and welfare of the surrounding St. Croix communities. The Limetree Defendants were undercapitalized and entirely

reliant on their financial backers as described below for all aspects of their management and operations. The outcome of cutting these corners was swift and predictable: a series of significant contamination incidents that had devastating consequences for the local communities, including severe impacts to the property, health, safety, and well-being of residents and property owners.

3.     As a result of Defendants' wrongful, negligent, and reckless behavior, Plaintiffs and the Class have suffered economic damages to their real and personal property, as well as personal injuries, due to the contamination incidents and Toxic Contaminants arising from the Refinery. Plaintiffs and the Class, and their real and personal property, have been unnecessarily exposed to the Toxic Contaminants because of Defendants' failure to restart, operate, and/or maintain the Refinery responsibly and lawfully. In addition, Plaintiffs and the Class were and are being subjected to the Toxic Contaminants because of Defendants' conduct in restarting, operating, and/or maintaining the Refinery, as well as because of their negligent hiring, supervision, and oversight.

4.     Defendants' conduct at the Refinery resulted in the release of airborne matter that was rained and spread upon St. Croix, and scattered so that persons and properties in the nearby geographic areas were and are being exposed to the Toxic Contaminants.

5.     The Toxic Contaminants, as well as odors, gases, vapors, and fumes containing harmful substances, have been and continue to be sources of hazardous substance emissions into, onto, within, and surrounding real property and personal property, as well as persons in the affected geographic areas, and Defendants have not accepted responsibility and remediated the problems.

6.     The release of the Toxic Contaminants, odors, gases, vapors, and fumes from the Refinery has impacted Plaintiffs' and Class Members' real property and personal property, negatively affected property values, contaminated and harmed the local water supply, is a blight

and nuisance on Plaintiffs' and the Class members' communities, and has deprived Plaintiffs and Class members of their free use and enjoyment of their real and personal property, including the ability to use their own drinking water cisterns or wells.

7.    Plaintiffs bring this lawsuit to seek relief to remedy the harms from Defendants' negligent, reckless, and careless ownership, restarting, operation, maintenance, hiring, investment and/or work performed at the Refinery. Plaintiffs bring this action individually and on behalf of the Class defined below who have suffered economic and non-economic injuries as a result of the contamination incidents that occurred and are occurring at the Refinery, including but not limited to the known incidents that occurred on February 4, 2021, April 23, 2021, May 5, 2021, and/or May 12, 2021 (further defined and described below, and collectively referred to herein, along with any other contamination incidents that have occurred since the Refinery reopened, as the "Toxic Incidents").

8.    Plaintiffs and the Class members' damages further include, without limitation: (a) all economic costs associated with a complete remediation of all real and personal property damage resulting from the Toxic Incidents; (b) all economic costs associated with a medical monitoring program to be established for the continual screening and detection of illnesses, diseases, or disease processes necessitated by the exposure to the Toxic Contaminants; and (c) the diminution in the value of Plaintiffs' and Class members' real estate that was affected by the Toxic Contaminants.

9.    Defendants damaged the real and personal property of Plaintiffs and the Class, the personal well-being of Plaintiffs and the Class, as well as St. Croix's economy, due to the Refinery's wrongful emission and discharge of the Toxic Contaminants.

10.    St. Croix is an island in the Caribbean Sea that is approximately 22 miles long (east to west) and 7 miles wide (north to south). As of the 2020 U.S. Census, St. Croix's population was

approximately 41,004. The Refinery is located on the southern shore of St. Croix, near the middle of the island, as shown in the image below:



11.     The Refinery was originally owned and/or operated by Hess Oil Virgin Islands Corporation ("HOVIC"). Facility operations began in or around 1965. On October 30, 1998, Amerada Hess Corporation, the parent company of HOVIC, and Petroleos de Venezuela, S.A. ("PDVSA") formed a new corporation, HOVENSA L.L.C. ("HOVENSA"), that acquired ownership and operational control of the St. Croix Refinery formerly known as HOVIC.

12.     Prior to its attempted restart in February 2021, the Refinery had previously been closed for many years due, in part, to other environmental disasters emanating from the Refinery that threatened and damaged St. Croix's residents and economy.

13.     Only upon the reliance on the Limetree Defendants' assurances that the Refinery could be refitted, operated, and properly maintained in an environmentally safe manner, was the Refinery allowed to attempt to reopen in February 2021.[1] Defendants assured the public that

---

"[i]ndustry leading safety performance was maintained throughout the restart project …." but in reality, it was not.[2]

14.     On February 1, 2021, Defendant EIG Global Energy Partners, a controlling investor in Limetree Bay Ventures, LLC, and one of several entities that controlled the Limetree Defendants, announced that the Refinery had successfully resumed operations and begun production and commercial sales of refined products.

15.     Within four days of the Refinery's reopening, however, the first environmental disaster occurred, and numerous incidents occurred subsequently, including the Refinery showering oil on St. Croix residents twice, spewing Toxic Contaminants and sulfuric gases into the surrounding area, and releasing hydrocarbons and toxic fumes which has continued to the present.

16.     Finally, in May 2021, the U.S. Environmental Protection Agency ("EPA") shut the Refinery down, stating that the Refinery's continued operation was an "imminent" threat to the health of people on the island.[3] The condition of the Refinery has not improved in the nearly two years since the Toxic Incidents occurred. In December 2022, the EPA found that the Refinery continued to store chemicals to be used in petroleum refining, including 40,000 pounds of anhydrous ammonia, which is poisonous, flammable and highly corrosive. Further, the EPA noted piping and valves used to handle more than 37,000 pounds of liquified petroleum gas "in an advanced state of corrosion and disrepair" with the potential for release of ammonia, liquified

---

[2] *Id.*
[3] *In the matter of Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC*, CAA-02-2021-1003 (E.P.A., Region 2) (May 14, 2021) ("May 14 Order"), available at https://www.epa.gov/sites/default/files/2021-05/documents/limetree_bay_303_order_-_caa-02-2021-1003.pdf (last accessed January 17, 2023).

petroleum gas, amine, hydrogen sulfide or fire. The release of Anhydrous ammonia would be catastrophic to those persons living or working or in the areas surrounding the Refinery.[4]

17.     The consequences of the Toxic Incidents to date have been swift and dire. The Toxic Contaminants, including, without limitation, toxic chemicals, harmful gasses, and oily mists, were released into the air containing toxins, and visible droplets of oil literally fell from the sky onto the island and the people who resided there, and settled on roofs and in cistern systems, and on the ground, contaminating soil and vegetation.

18.     According to the EPA, "[t]his … community has suffered through at least four incidents that have occurred at the facility, and each had an immediate and significant impact on people and their property."[5] Specifically, the Toxic Incidents occurred on February 4, 2021, April 23, 2021, May 5, 2021, and May 12, 2021, causing harm and damages to Plaintiffs and the Class.

19.     Plaintiffs and the Class bring this lawsuit to seek adequate redress for the harms and damages caused by Defendants via their negligent and reckless ownership, restart, operation, maintenance, hiring, supervision, and/or work performed at the Refinery, that led to the Toxic Incidents, and among other things, to pierce the corporate veil and fraudulent structure of the Limetree Defendants and hold accountable all those who are truly responsible for the Toxic Incidents. Plaintiffs and the Class seek injunctive relief, damages, punitive damages, and reasonable attorneys' fees and costs due to Defendants' violations of law as alleged herein.

---

[4] News Release, EPA, "Legally Binding Agreement Requires Owners of Refinery on St. Croix to Remove Dangerous Chemicals" (December 5, 2022), available at https://www.epa.gov/newsreleases/legally-binding-agreement-requires-owners-refinery-st-croix-remove-dangerous-chemicals (last accessed January 17, 2023).
[5] News Release, EPA, "EPA Uses Emergency Powers to Protect St. Croix Communities and Orders Limetree Bay Refinery to Pause Operations" (May 14, 2021), available at https://www.epa.gov/newsreleases/epa-uses-emergency-powers-protect-st-croix-communities-and-orders-limetree-bay-refinery (last accessed Jan. 17, 2023).

## II.    JURISDICTION AND VENUE

20.    This Court has diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) and 1453, because the Class consists of at least 100 Class members, the citizenship of at least one Class member is different from that of Defendants, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

21.    This Court has federal question jurisdiction over Plaintiffs' claims arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), pursuant to 28 U.S.C. § 1331 because those claims arise under a federal statute.

22.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of a common nucleus of facts with the federal claims alleged herein.

23.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and a substantial part of the real and personal property that is the subject of this action is situated in this District. Venue is also proper pursuant to 42 U.S.C. § 9613(b) because the unlawful Toxic Incidents and resulting damages occurred within this District.

## III.    PARTIES

24.    Plaintiffs are citizens and residents of St. Croix, U.S. Virgin Islands, who live in communities adjacent to and/or located downwind from the Refinery.

25.    Plaintiff Beecher Cotton is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

26.    Plaintiff Pamela Colon is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

27.     Plaintiff Sirdina Isaac-Joseph is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

28.     Plaintiff Esther Clifford is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

29.     Plaintiff Sylvia Browne is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

30.     Plaintiff Alvina Jean-Marie Ilarraza is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

31.     Plaintiff Ryan Alleyne is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

32.     Plaintiff Agnes Augustus is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

33.     Plaintiff Cesarina Miranda is a citizen and resident of St. Croix, U.S. Virgin Islands and was affected by the discharges and will continue to be adversely affected by the Refinery.

34.     Defendants Limetree Bay Ventures, LLC, Limetree Bay Holdings, LLC, Limetree Bay Refining, LLC, LBR Liquidating Trust, David M. Dunn, Limetree Bay Terminals, LLC dba Ocean Point Terminals, Arclight Capital Partners, LLC, Freepoint Commodities, LLC, Universal Plant Services, (VI), LLC, Excel Construction & Maintenance VI, Inc., Elite Turnaround Specialists, Ltd., Pinnacle Services LLC, Versa Integrity Group, Inc., National Industrial Services, LLC, and John Does 1-100, each played a role with respect to the ownership, restart, operation,

maintenance, hiring, supervision, and/or work performed at the Refinery, that led to the Toxic Incidents.

35.    Defendant Limetree Bay Ventures, LLC ("Limetree Bay Ventures") was a holding company that consisted of Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC dba Ocean Point Terminals, and was owned by controlling entities, Arclight Capital Partners, LLC and Freepoint Commodities, LLC. Limetree Bay Ventures is a Delaware limited liability company with its headquarters located in the U.S. Virgin Islands and does business in the U.S. Virgin Islands.

36.    Defendant Limetree Bay Holdings, LLC ("Limetree Bay Holdings") was an entity involved in purchasing the Limetree Bay Facility – consisting of the Limetree Bay Terminal and Limetree Bay Refinery (the "Limetree Bay Facility") – out of the HOVENSA bankruptcy described below. Upon information and belief, at the time of the purchase of the Limetree Bay Facility by Limetree Bay Holdings, LLC, Defendants Arclight Capital Partners, LLC and Freepoint Commodities, LLC owned Limetree Bay Holdings. Limetree Bay Holdings is a Delaware limited liability company with its headquarters in the U.S. Virgin Islands and did business in the U.S. Virgin Islands.

37.    Defendant Limetree Bay Refining, LLC ("Limetree Bay Refining") was organized under the laws of the Virgin Islands and was doing business in the U.S. Virgin Islands at all times relevant hereto. Limetree Bay Refining was one of the entities responsible for operating the Refinery at the time of the Toxic Incidents. Limetree Bay Refining filed for Chapter 11 bankruptcy on July 14, 2021, in the U.S. Bankruptcy Court for the Southern District of Texas (the "Limetree Bay Refining Bankruptcy"). Because of its prior bankruptcy, Limetree Bay Refining is a nominal defendant "for the purpose of (a) establishing Claims against the Debtors and their Estates, and (b)

preserving rights with respect to insurance coverage for such Claims, if any, and for no other purpose." *In re: Limetree Bay Services, LLC, et al.*, No. 21-32351, Doc. 1454 (Bankr. S.D. Tex. 5/20/2022).

38.     The real party in interest for Limetree Bay Refining is Defendant Limetree Bay Refining Liquidating Trust (the "Liquidating Trust"), a trust established for the purpose of liquidating the assets of Limetree Bay Refining of which David M. Dunn is the Trustee.  As of "the Effective Date, all of the Debtors' rights and their Estates' rights under any Insurance Policy to which the Debtors and/or the Debtors' Estates may have a claim or potential claim for coverage [] vest[ed] with the Liquidating Trust." *Id.* at p. 42.

39.     As set forth in the Limetree Bay Refining Bankruptcy Court's May 20, 2022 Order Approving Disclosure Statement on a Final Basis and Confirming Chapter 11 Plan of Liquidation (the "Plan"), the Plan expressly preserves certain claims for Plaintiffs in this matter, as noted by the following exception contained in the "Release" section of the Plan:

> Notwithstanding anything to the contrary herein, the Insurance Claimants and their counsel may file, assert, and/or continue to assert their Claims and any putative class action litigation, including the Putative Class Action Litigation, against any of the Debtors as nominal defendants for the purpose of (a) establishing Claims against the Debtors and their Estates and (b) preserving rights with respect to insurance coverage for such Claims, and for no other purpose.

Plan at Section XIV. B., No. 21-BK-32351, ECF No. 1454. The term "Insurance Claimants" is defined in the Plan to include, among others, "all Named Plaintiffs and all Putative Class Members in the Putative Class Actions" including the above-captioned matter. *Id.* at II. A.¶¶ 86, 145-146.

40.     At the time of the Toxic Incidents, Limetree Bay Refining was a U.S. Virgin Islands limited liability company owned and controlled by Defendants Arclight Capital Partners, LLC and

Freepoint Commodities, LLC, among others. The Liquidating Trust is successor-in-interest to Limetree Bay Refining.

41.     Defendant David M. Dunn, of Province, LLC, is the Liquidating Trustee (the "Liquidating Trustee") of the Liquidating Trust, effective June 10, 2022, which has been established pursuant to the Plan.

42.     Defendant Limetree Bay Terminals, LLC, dba Ocean Point Terminals ("Ocean Point") operates the Limetree Bay Terminal. Limetree Bay Terminals dba Ocean Point Terminals is a U.S. Virgin Islands limited liability company with its headquarters located in the U.S. Virgin Islands and does business in the U.S. Virgin Islands. Limetree Bay Terminals dba Ocean Point Terminals is owned and controlled by Defendants Arclight Capital Partners, LLC and Freepoint Commodities, LLC, among others.

43.     Defendant Arclight Capital Partners, LLC ("Arclight") is a private equity firm focused on energy infrastructure investments, and a member of the joint venture that purchased the Limetree Bay Facility in 2016, and owned and operated the Limetree Bay Facility at the time of the Toxic Incidents, along with Defendant Freepoint Commodities, LLC. Arclight is a Delaware limited liability company with its headquarters located in Boston, Massachusetts and does business in the U.S. Virgin Islands.

44.     Defendant Freepoint Commodities, LLC ("Freepoint") is a member of the joint venture that purchased the Limetree Bay Facility in 2016 and owned and operated the Limetree Bay Facility at the time of the Toxic Incidents, along with Defendant Arclight. Freepoint is a Delaware limited liability company with its headquarters located in Stamford, Connecticut and did business in the U.S. Virgin Islands. Freepoint describes itself as a merchant of physical commodities and a financer of upper and mid-stream commodity-producing assets.

45.     Defendant EIG Global Energy Partners, LLC ("EIG") is a private equity company that purports to specialize in private investments in energy and energy-related infrastructure. Funds and accounts managed by EIG led the preferred equity portion ($550 million) of a $1.25 billion financing package that Defendant Limetree Bay Ventures secured in November 2018 to fund the restarting of the Refinery. EIG is incorporated in the State of Delaware with its principal place of business located in Washington, D.C. EIG does business in the U.S. Virgin Islands.

46.     Defendant BP Products North America, Inc. ("BP") is incorporated in the State of Delaware with its principal place of business located in Chicago, Illinois. As further alleged herein, BP has significant involvement with the operation of the Refinery through its long-term tolling, supply, and offtake agreements with the Limetree Defendants.

47.     Notably, BP provided liquidity to fund the Refinery through a series of agreements entered into with certain of the Defendants.  Specifically, in or about November 2018, BP entered into agreements governing the supply of crude oil and additional investments in the Refinery, including a feedstock agreement, a product off-take agreement, and a tolling agreement. Under the terms of the feedstock agreement, BP agreed to provide crude oil (*i.e.*, feedstock) and other materials to the Refinery. Per the off-take Agreement, BP agreed to market refined petroleum products from the Refinery. As consideration for a share in the net margin of the Refinery, BP agreed to invest up to $533 million in the Refinery to complete improvements and expansions related to the manufacture of certain petroleum products, including low-sulfur transportation fuel. BP was to recoup its investment under the tolling agreement via its share in the net margin generation of the Refinery.

48.     Defendant Universal Plant Services, (VI), LLC ("UPS") is a Houston, Texas and Deer Park, Texas based privately-owned company with approximately 2,000 compensated

personnel providing services to the refining, petrochemical, and power generation sectors. UPS provides project management, installation, maintenance, and repair services for a variety of industries, including oil and gas, and specializes in rotating, fixed, reciprocating, and electrical equipment. UPS's principal place of business is 806 Seaco Court, Deer Park, Texas 77536. Defendant UPS performed certain work refitting the Refinery prior to its restart in February 2021. Specifically, on or about February 21, 2019, Defendant UPS and Limetree Bay Refining LLC entered into a contract pursuant to which UPS performed certain services at the Refinery, including engaging over 250 personnel on-site to "install, uninstall, repair, and overhaul plant equipment, including fixed, rolling, rotating, reciprocating, and electrical equipment (including steam turbines)." *See* Case No. 21-BK-32351, ECF No. 1404-10. In the Limetree Bay Refining Bankruptcy proceeding, UPS is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $24,423,282.42 related to work that it performed at or for the Refinery. *Id.* at ECF No. 1.

49.    Defendant Excel Construction & Maintenance VI ("Excel") is a privately-owned industrial contractor incorporated and headquartered in the Virgin Islands. Defendant Excel performed certain work refitting the Refinery prior to its restart in February 2021. Specifically, Excel entered into a $240 million 24-month contract for work relating to the "restoration and restart" of Limetree Bay Terminal.[6] The project consisted of two phases. The first phase established an API-653 Tank Inspection Program "which set forth the requirements to inspect the assigned and report discoveries." *Id.* The reports were to identify "all the repairs to restore the

---

[6]Excel USA, *Limetree Bay Terminal Restoration and Restart*, available at https://www.excelusa.com/projects/limetree-bay-terminal-restoration-and-restart (last accessed Jan. 17, 2023); *see also* Case No. 21-BK-32351, ECF No. 310 ("Excel is a contractor to Debtor providing labor and materials incorporated into the work done by Debtor at the Property on a project known generally as the Limetree Refinery Restart Project[.]").

storage tanks to operational services" and establish subsequent inspection intervals. *Id*. In phase two, Excel purportedly developed the repair execution strategy and performed the construction work to recondition the tanks. *Id*. In the Limetree Bay Refining Bankruptcy proceeding, Excel is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $22,325,200.82 related to work that it performed at or for the Refinery. Case No. 21-BK-32351, ECF No. 1.

50.     Defendant Elite Turnaround Specialists, Ltd. ("ETS") is a Texas-based limited partnership.  It is a part of the Stronghold Companies ("Stronghold"), which "work together to provide refining, petrochemical, and tank services."[7] Located at 225 S. 16th Street in LaPorte, Texas, ETS provides "complete turnaround and fabrication services with the highest skilled crafts and a custom-designed equipment fleet…"[8] Stronghold is a subsidiary of Quanta Services, Inc., a Delaware corporation. ETS performed certain work refitting the Refinery prior to its restart in February 2021. In the Limetree Bay Refining Bankruptcy proceeding, ETS is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $15,330,475.03 related to work that it performed at or for the Refinery. Case No. 21-BK-32351, ECF No. 1.

51.     Defendant Pinnacle Services LLC ("Pinnacle") is a privately-held company based in Christiansted, St. Croix. The company was "formed in 2002 [specifically] to provide [a] comprehensive set of services to the HOVENSA refinery, now owned and operated by Limetree Bay Terminals, LLC dba Ocean Point Terminals, and its sub-contractors under a shared services

---

[7]Stronghold Companies, *About Stronghold Companies*, available at https://www.thestrongholdcompanies.com/about-us/ (last accessed Jan. 17, 2023).
[8]Stronghold Companies, *About Elite Turnaround Specialists*, available at https://www.thestrongholdcompanies.com/about-us/companies/companies-ets-efl/ (last accessed January 17, 2023).

delivery model which utilizes the simple concept of centralizing commonly used, non-core services and providing them from a third party."[9] Starting in 2016, Pinnacle "supported Limetree Bay Energy in the restart of the 32 million barrel terminal and the 200,000 barrel per day refinery." *Id*. In the course of its work on this project, Pinnacle "filled over 350 management, supervision and craft positions during the engineering, procurement, construction and commissioning" of the restart project, and thus was responsible for a significant portion of the hiring at the Refinery. *Id*. Pinnacle is headquartered at 6002 Diamond Ruby, Ste 3-125, Christiansted, St. Croix, U.S. Virgin Islands, 00820. In the Limetree Bay Refining Bankruptcy proceeding, Pinnacle is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $2,986,320.12 related to work that it performed at or for the Refinery. Case No. 21-BK-32351, ECF No. 1.

52.     Defendant Versa Integrity Group, Inc. ("Versa") is a privately held company that provides industrial services consisting of inspection, advanced non-destructive testing, asset integrity, heat treatment, and rope access. Versa has locations in Gretna, Louisiana, Baton Rouge, Louisiana, Lafayette, Louisiana, Sulphur, Louisiana, Houston, Texas, Freeport, Texas, Beaumont, Texas, Corpus Christi, Texas, Pascagoula, Mississippi, Orlando, Florida, Tampa, Florida, Oakley, California, Pittsburgh, Pennsylvania, St. Croix, U.S. Virgin Islands, and Los Angeles, California. Versa's headquarters are located at 1 Lake Shore Drive, 1700, Lake Charles, Louisiana, 70601. Versa performed certain work at the Refinery prior to its restart in February 2021. In the Limetree Bay Refining Bankruptcy proceeding, Versa is listed among the creditors who have the 30 largest

---

[9] Pinnacle Services, *Company Overview*, available at https://pinnaclevi.com/company/about-our-company/ (last accessed January 17, 2023).

claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $4,196,472.15 related to work that it performed at or for the Refinery. *Id.* at ECF No. 1.

53.     Defendant National Industrial Services, LLC ("NIS") is a construction company that focuses on building and improving industrial facilities. NIS maintains a location in St. Croix and according to its website performed work prior to and in connection with the Refinery's restart in February 2021. NIS's address is P.O. Box 1545 Kingshill, St. Croix, U.S. Virgin Islands 00851. In the Limetree Bay Refining Bankruptcy proceeding, NIS is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $12,052,033.76 related to work that it performed at or for the Refinery. *Id.* at ECF No. 1.

54.     Defendants UPS, Excel, ETS, Pinnacle, Versa, and NIS are collectively referred to herein as the "Contractor Defendants."

55.     Defendants John Does 1-100 are individuals or business or corporate entities incorporated in or doing business in St. Croix, U.S. Virgin Islands, whose true capacities are unknown to Plaintiffs, who therefore sue such defendants by such fictitious names, and who will amend this Complaint to show the true names and capacities of each such Doe Defendant when ascertained via discovery. Each Defendant Doe is legally responsible in some manner for the events, happenings, and/or tortious and unlawful conduct that caused the injuries and damages alleged in this lawsuit.

## IV.     FACTUAL ALLEGATIONS

### A.     General Background Regarding Refineries

56.     Refineries "separate crude oil into a wide array of petroleum products through a series of physical and chemical separation techniques. These techniques include fractionation, cracking, hydrotreating, combination/blending processes, and manufacturing and transport."[10]

57.     According to the EPA, "[r]efineries in general emit a whole host of pollutants, ranging from nitrous oxides ("NOX"), sulfur dioxide ("SO2"), and carbon monoxide ("CO") to volatile organic compounds ("VOC"), hydrogen sulfide ("H2S"), and particulate matter ("PM")."[11] Additionally, the EPA has stated that "[e]missions … may include carbon particles (soot), unburned hydrocarbons, CO, partially burned and altered hydrocarbons, NOX and, if sulfur containing material such as hydrogen sulfide is flared, SO2."[12]

58.     As demonstrated in this lawsuit, when a refinery is not properly maintained and operated, and appropriate safety mechanisms are not put into place, the results can be catastrophic to the local environment and the health, livelihood, and property of the communities in the surrounding areas, and individuals who reside or work there.

### B.     Background Regarding the Limetree Bay Refinery

59.     Prior to its reopening in February 2021, the Refinery was called HOVENSA[13] and while it was operational, it was one of the world's largest oil refineries. The historical roots of the Refinery are intwined with environmental racism, as its arrival in St. Croix in the mid-1960s promised economic prosperity to a largely poor, Black, Indigenous, People of Color ("BIPOC")

---

[10]May 14 Order, available at https://www.epa.gov/sites/default/files/2021-05/documents/limetree_bay_303_order_-_caa-02-2021-1003.pdf (last accessed January 17, 2023).

[11] *Id.* at § 19.

[12] *Id.* at § 23.

[13]EPA, *Hazardous Waste Cleanup: HOVENSA Environmental Response Trust, in Christiansted, U.S. Virgin Islands*, available at https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-hovensa-llc-christiansted-us-virgin-islands ("EPA HOVENSA Profile")(last accessed January 17, 2023).

region.[14] The Refinery took over local farmland, wetlands, mangroves and a pristine bay and became one of the largest oil producers in the world, while at the same time causing devastating environmental impacts on the local communities. *Id*. Decades later and following just the latest in a long series of severe environmental disasters caused by the Refinery, it is well-documented that local residents have been severely damaged by the Refinery. *Id*.

60. According to the EPA, the Refinery "is located at Limetree Bay, St. Croix, U.S. Virgin Islands. It is a petroleum refinery covering 1,500 acres in what is known as South Industrial Complex, on the south central coast of St. Croix. Operations at the facility began in 1965 under HOVIC. On October 30, 1998 Amerada Hess Corporation [now the Hess Corporation], the parent company of HOVIC, and Petroleos de Venezuela, S.A. (PDVSA) formed a new corporation named HOVENSA LLC, which acquired ownership and operational control of the HOVIC facility. The facility's maximum design capacity was 545,000 barrels (1 barrel = 42 gallons) of crude oil per day. Over 60 different types of crude oil had been processed at the facility. By means of distillation and other refining processes, crude oil is separated into various components. Light ends (fuel gas) are sent to the facility's fuel system; naphtha, jet fuel, kerosene and No. 2 oil are further processed to remove sulfur."[15]

61. In 2012, HOVENSA closed after causing environmental disasters, including the contamination of the only aquifer on St. Croix that could be used for safe, potable water, and consequently violating the Clean Air Act. Specifically, investigators had discovered that the pipes

---

[14]Greenmatters, *A Shuttered St. Croix Oil Refinery Is Currently at Risk of Exploding* (October 31, 2022), available at https://www.greenmatters.com/news/limetree-bay-st-croix (last accessed January 17, 2023).
[15] EPA HOVENSA Profile, available at https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-hovensa-llc-christiansted-us-virgin-islands (last accessed January 17, 2023).

carrying the Refinery's waste product had been corroding, slowly leaking more than 43 million gallons of oil into the island's only aquifer.[16]

62.     As a result of the massive leak, EPA ordered Hovensa to pay civil penalties of more than $5 million and spend more than $700 million in new pollution controls to protect the public health and resolve Clean Air Act violations. [17] The EPA also required Hovensa to implement new and upgraded pollution controls, more stringent emission limits and aggressive monitoring, and leak detection and repair practices to reduce emissions from Refinery equipment and process units. *Id*.

63.     Instead of accepting responsibility for the environmental disaster it caused and for polluting the aquifer, the ventures that owned and ran the HOVENSA facility as of 2012 declared bankruptcy (the "HOVENSA bankruptcy") [18] and shut the plant down rather than capitulate to the $700 million in new pollution controls dictated by the EPA and DOJ at the time.

64.     Since their involvement with the Refinery, Defendants have been aware of the previous contamination of St. Croix's only aquifer caused by HOVENSA and, therefore, that cisterns became the primary source of safe, potable water for many residents of St. Croix. Thus, at all times relevant hereto, Defendants knew and understood that if the Limetree Bay Facility caused

---

[16] Kristopher Tigue, *Donald Trump's Parting Gift to the People of St. Croix: The Reopening of One of America's Largest Oil Refineries*, Inside Climate News, Mar. 21, 2021, available at https://insideclimatenews.org/news/21032021/trump-st-croix-virgin-island-oil-refinery/ (last accessed January 17, 2023).

[17] News Release, U.S. Department of Justice ("DOJ"), "Nation's Second Largest Refinery to Pay $700 Million to Upgrade Pollution Controls at U.S. Virgin Islands Facility" (Jan. 16, 2011), available at https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands (last accessed January 17, 2023).

[18] Marriana Parraga, et al, *Hovensa faces bankruptcy, owes $1.86 billion to owners,* Reuters, Sep. 17, 2015, available at https://www.reuters.com/article/bankruptcy-hovensa/hovensa-faces-bankruptcy-owes-1-86-billion-to-owners-idUSL1N11N20A20150917 (last accessed January 17, 2023).

further events that polluted and impacted cisterns on the island, this would effectively take away the only access to safe, potable water for residents of St. Croix.

### C.     The Restart of the Limetree Bay Refinery

65.     In or around January 2016, Defendants Arclight and Freepoint, through Limetree Bay Holdings, completed the purchase of the Limetree Bay Facility through a Section 363 Bankruptcy Sale in HOVENSA's bankruptcy. After closing the acquisition of the Limetree Bay Facility from HOVENSA, Dan Revers, Managing Partner and Co-Founder of Arclight, stated that "[c]losing on the St. Croix Facility represents the culmination of an innovative and complex transaction executed by Arclight in conjunction with its partner Freepoint."[19]

66.     Shortly after purchasing the Limetree Bay Facility in 2016, the Limetree Defendants began preparing to restart the Refinery, including by collaborating with Defendant BP to supply feedstocks to the refinery and manage product offtakes to enable the Limetree Defendants to restart and operate the Refinery.

67.     Defendant BP entered into long-term tolling, supply, and offtake agreements for a portion of the Refinery manufacturing capacity. A tolling agreement is an agreement between a refinery and an oil supplier, such as BP, to process crude oil for a set fee, or toll. An offtake agreement is an agreement for a company to purchase a set amount of the refinery's future production. As part of these agreements, BP was to serve as the Refinery's "supply and offtake counterparty." A "supply counterparty" is an entity that agrees to supply a product under contractual terms, while an "offtake counterparty" agrees to buy a product. In essence, this meant

---

[19]Joint Press Release, Arclight and Freepoint, "Arclight Capital Partners and Freepoint Commodities Close Acquisition of St. Croix Refinery Assets from HOVENSA" (Jan. 7, 2016), available at https://www.prnewswire.com/news-releases/arclight-capital-partners-and-freepoint-commodities-close-acquisition-of-st-croix-refinery-assets-from-hovensa-300201346.html (last accessed January 17, 2023) (emphasis added).

that BP was contractually obligated to sell crude oil to the Refinery and also to buy refined products from the Refinery. At the time the agreements with BP were announced, Government House issued a statement indicating: "Limetree Bay Refining announced Friday that it has reached a 'definitive agreement' with British Petroleum to *operate* the refinery on St. Croix's south shore."[20]

68.     The Limetree Defendants' ability to restart the Limetree Bay Refinery was advanced and dependent upon their securing financing, in part from Defendant EIG, in 2018. On November 30, 2018, the Limetree Defendants announced that they had closed on a $1.25 billion financing package, comprised of $550 million of preferred equity and a $700 million term loan. The preferred equity was led by funds and accounts managed by Defendant EIG. In addition, Defendant Arclight also made a significant additional common equity commitment to Limetree Bay in conjunction with the financing.

69.     In connection with the tolling, supply, and offtake agreements with Defendant BP, the $1.25 billion financing package provided the financial resources to attempt to restart the Refinery, albeit that it was ill-advised at all times and fated to disaster because of the severe undercapitalization of the project that the financial backers controlled at all times.

70.     Specifically, on November 30, 2018, Limetree Bay Ventures, which was undercapitalized, published a press release, setting forth the following information, including describing the direct involvement in the project of several of the Defendants named herein:

> Nov. 30, 2018 – Limetree Bay Ventures announced today that it has closed a $1.25 billion financing to restart its refinery located at Limetree Bay, St. Croix, U.S. Virgin Islands. *The company is undertaking the project in conjunction with the tolling, supply and offtake agreements that it entered into with BP Products North America earlier this month. The common*

---

[20]The St. Thomas Source, *BP Signs to Supply Arclight Refinery; No Word on $70 Million Promised on Closing,* Nov. 17, 2018, available at https://stthomassource.com/content/2018/11/17/bp-signs-to-supply-arclight-refinery-no-word-on-70-million-promised-on-closing/ (last accessed January 17, 2023).

*equity in Limetree Bay is owned by affiliates of ArcLight Capital Partners, Freepoint Commodities, and a leading sovereign wealth fund*.

*"The closing of the financing provides the resources necessary to complete the refinery restart,"* said Brian Lever, President of Limetree Bay Refining. "We have 1,300 workers currently involved in the project and expect a significant ramp in activity over the coming months as we prepare for restart by the end of next year. *We are very grateful to the broad team that has made this possible*."

Daniel Revers, Managing Partner and Founder of ArcLight, added "We are excited to continue building Limetree Bay into an environmentally compliant global energy hub in the U.S. Virgin Islands. *The Limetree Bay transaction harnesses ArcLight's deep energy expertise. In particular, ArcLight's current and former ownership of over 100 million barrels of storage capacity has already helped Limetree Bay develop a robust terminal business*. We also have a strong history of successfully completing large-scale capital projects. *This complex transaction makes full use of ArcLight's suite of specialized capabilities including financial structuring, construction management, implementation of operational best practices, commodity management, human resources, and environmental management. Our operational affiliate, Consolidated Asset Management Services (CAMS), played a key role in these efforts*."

The financing comprises $550 million of preferred equity and a $700 million term loan. The preferred equity was led by funds and accounts managed by EIG Global Energy Partners, which was joined by other investors including funds affiliated with BlackRock and Barclays. The term loan was led by Westbourne Capital. In conjunction with the financing, ArcLight also made a significant additional common equity commitment to Limetree Bay.

Barclays acted as exclusive financial advisor to Limetree Bay and lead placement agent on the preferred equity issuance by Limetree Bay. EIG Global Energy Partners Capital Markets, LLC served as co-placement agent on the preferred equity issuance by Limetree Bay. Goldman Sachs and Barclays acted as joint lead arranger and joint bookrunner on the term loan issuance by Limetree Bay Refining.[21]

---

[21] Press Release, Limetree Bay Ventures, "Limetree Bay Ventures Closes $1.25 Billion Financing to Restart Its Refinery in St. Croix" (Nov. 30, 2018), available at https://www.limetreebayenergy.com/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix/ (emphasis added) (last accessed January 17, 2023).

71.     The Limetree Defendants had aimed to resume refining oil at the Limetree Bay Refinery by the end of 2019, a target date timed to take advantage of expected changes in area fuel sulfur regulations scheduled to take effect January 1, 2020. The restart was delayed to early 2020 due to corrosion issues and then further delayed to July 2020 due to the Covid-19 pandemic. The restart was again pushed back into August and September 2020.

72.     Finally, after receiving a fast-tracked approval from the Trump administration in December 2020, the Limetree Bay Refinery represented that it was ready to reopen.

73.     The unrealistic restart date resulted from pressure placed on the Limetree Defendants by Defendant BP to begin refining, or the contract with BP would be canceled.

74.     Defendants knew full-well that the Refinery was undercapitalized, was not in a proper condition to reopen, that it would take hundreds of millions or billions of dollars to update the Refinery into safe operating condition, and that the premature start-up would result in environmental discharges and danger to the community. Indeed, the Limetree Defendants knew that they were understaffed, that they had cut corners, and that they had not made the necessary investments to bring the Refinery into safe operating condition, leaving them with a 55-year-old corroded refinery that did not have the proper safety equipment and that was ripe for serious and foreseeable operational problems.

75.     After their acquisition of the Limetree Bay Facility, Defendants Arclight and Freepoint then appointed Darius Sweet as Chief Executive Officer ("CEO") of Limetree Bay Terminals. Arclight, Freepoint, and the other primary financial backers controlled hiring and management of the Limetree Defendants. Upon his appointment, Mr. Sweet emphasized how essential Arclight's and Freepoint's financial support was for the proper operation and functioning of the Limetree Bay Facility. Sweet noted, "[w]ith Arclight and Freepoint's strong sponsorship,

L[imetree Bay] Terminals will deploy significant investment to revitalize the St. Croix facility as a safety-oriented, environmentally compliant, multi-purpose energy center ....."[22]

76.     In Arclight's own words, Arclight served as a "*hands-on*" owner and operator of the Limetree Bay Facility.[23] After the acquisition of the Limetree Bay Facility, Arclight directed the securing of additional financing to restart the Refinery. Mr. Revers, the Managing Partner and Co-Founder of Arclight, indicated that securing financing to restart the Refinery ". . . ma[de] full use of Arclight's suite of specialized capabilities including financial structuring, construction management, implementation of operational best practices, commodity management, human resources, and environmental management."[24]

77.     As to "environmental management," among other federal and state environmental regulations and statutes, the Refinery is subject to the Clean Air Act and the Virgin Islands State Implementation Plan ("SIP") promulgated thereunder. The EPA previously issued a number of permits to HOVENSA pursuant to Title V of the Clean Air Act that were subsequently transferred to the Limetree Bay Facility on or about March 9, 2016 and November 5, 2018.[25] These permits included all applicable requirements that were in effect during HOVENSA's operation.

---

[22]  Joint Press Release, Arclight and Freepoint, "Arclight Capital Partners and Freepoint Commodities Announce Appointment of Darius Sweet as Chief Executive Officer of Limetree Bay Terminals, LLC" (Mar. 4, 2016), available at https://www.prnewswire.com/news-releases/arclight-capital-partners-and-freepoint-commodities-announce-appointment-of-darius-sweet-as-chief-executive-officer-of-limetree-bay-terminals-llc-300230929.html   (last accessed January 17, 2023).
[23] Press Release, Limetree Bay Ventures, "Limetree Bay Ventures Closes $1.25 Billion Financing to   Restart   Its   Refinery   in   St.   Croix"   (Nov.   30,   2018),   available   at https://www.limetreebayenergy.com/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix/  (last accessed January 17, 2023).
[24]*Id*.
[25]EPA, *Limetree Bay Terminals and Limetree Bay Refining, LLC Profile Page*, available at https://www.epa.gov/vi/limetree-bay-terminals-and-limetree-bay-refining-llc   (last   accessed January 17, 2023)*.*

78.     The EPA, however, has determined that the Refinery has emitted, and (if maintained without significant changes) likely will continue to emit, pollutants including benzene, cumene, methyl isobutyl ketone, naphthalene, toluene, and xylene (mixed isomers),[26] each of which is listed as a "hazardous air pollutant" under the Clean Air Act.

79.     As to "implementation of operational best practices," the Limetree Defendants and their controlling financial backers as described herein rushed the reopening of the Limetree Bay Facility and operated the Refinery as an oil storage facility until it resumed its refining operations in February 2021. During that time, Defendants failed to adequately monitor and protect against the environmental harms caused by its storage operations. For example, on August 22, 2020, one of the Refinery's stormwater pumps failed as a result of heavy rainfall, and oil-polluted water overflowed into a containment pond and discharged into a nearby harbor.

80.     In December 2020, the EPA issued an additional Clean Air Act pollution permit (the "Plantwide Applicability Limit" or "PAL" permit), pursuant to which the Refinery was required to install the air monitoring equipment that HOVENSA had refused to install before filing for bankruptcy. The Limetree Defendants, however, appealed those requirements, among others, arguing that the requirements were too strict and were unnecessary, and upon information and belief, Defendants never installed the air monitoring equipment on which issuance of the PAL permit was conditioned.

81.     There were problems at the Refinery even before the start-up on February 1, 2021. For example, Limetree Bay Terminals, LLC issued a press release on January 14, 2021, stating, in pertinent part:

---

[26]EPA, *EPA Facility Information, Limetree Bay Refining LLC & Limetree Bay Terminals,* available at https://enviro.epa.gov/enviro/multisys2_v2.get_list?facility_uin=110000307864 (last accessed January 17, 2023).

St. Croix, U.S. Virgin Islands (January 14, 2021) – Limetree Bay Refining, LLC (Limetree) continues to progress on the startup of the refinery. Residents may have noticed a larger than usual flame at the top of the refinery's flare stack or may have heard a louder than usual noise from the flare during the last week. As part of the normal startup process, gases are sometimes routed to the flare system where they are safely burned. Steam is also routed to the flare to promote complete combustion of the gases and eliminate smoke. The combination of burning gases and steam can be noisy at times.

The flare activity and noise level will return to normal as soon as startup is complete, and the refinery is fully in normal operation.

The executive management of Limetree sincerely apologizes for any concern or inconvenience this flaring activity has caused to our neighbors, and we can assure you that we are working diligently to keep the noise levels as low as possible.[27]

82.     On February 1, 2021, after an almost ten (10) year hiatus, the Limetree Bay Facility restarted refinery operations. In press releases, the Limetree Defendants publicized that "Limetree Bay Refining, LLC, restarted [refinery] operations in February 2021, and is capable of processing around 200,000 barrels per day. Key restart work at the site began in 2018, including the 62,000 barrels per day modern, delayed Coker unit, extensive desulfurization capacity, and a reformer unit to produce clean, low-sulfur transportation fuels that will meet International Marine Organization ("IMO") standards required under international law in 2020."[28]

83.     In fact, Limetree Bay Terminals, LLC issued a press release dated February 1, 2021, stating, in pertinent part:

**Limetree Bay Ventures Commences Refinery Startup Operations**

---

[27] Press Release, Limetree Bay Terminals, LLC "Limetree Continues to Advance on Refinery Startup; Company Working to Reduce Noise Impacts" (Jan. 14, 2021), available at https://www.limetreebayenergy.com/limetree-continues-to-advance-on-refinery-startup-company-working-to-reduce-noise-impacts/ (last accessed January 17, 2023).

[28] *See* e.g. Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Appoints New Chief Financial Officer" (May 3, 2021), available at https://www.limetreebayenergy.com/limetree-bay-appoints-new-chief-financial-officer/ (last accessed January 18, 2021).

> ST. CROIX, U.S. Virgin Islands – February 1, 2021 – Limetree Bay Ventures, LLC ("Limetree" or "the Company"), a world-class refinery, terminal and logistics hub **controlled by EIG Global Energy Partners ("EIG")**, today announced that Limetree Bay Refining ("the Refinery") has successfully resumed operations and begun production and commercial sales of refined products.
>
> The Refinery is capable of processing over 200,000 barrels of crude oil and other feedstocks per day ….
>
> Mr. Rinker continued, "***The restart of a refinery is a complicated endeavor, requiring a first-class team of employees and contractors*** and a collaborative partnership between business and government.[29]

84.     Thus, among other things, this press release explicitly admitted that Limetree Bay Ventures, LLC was controlled by Defendant EIG, and further noted the importance of employees and contractors in restarting the Refinery.

85.     In reality, the Limetree Bay Facility was not properly constructed and refitted to function in a safe manner, in part because of the negligent and reckless manner in which the Refinery was owned, restarted, operated, and/or maintained, including, without limitation, because of the negligent and reckless hiring, supervision, and oversight implemented by Defendants, including the Contractor Defendants.

86.     Through their extensive and varied work at and/or for the Refinery, Defendants, including the Contractor Defendants, failed to ensure that the Refinery was properly rehabilitated prior to its restart in February 2021. Defendants, moreover, caused the Refinery to fall into a perilous and unsafe condition, ripe for the inevitable – but entirely preventable – Toxic Incidents that immediately followed.

---

[29] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Ventures Commences Refinery Startup Operations" (Feb. 1, 2021), available at https://www.limetreebayenergy.com/limetree-bay-ventures-commences-refinery-startup-operations/ (last accessed January 17, 2023) (emphasis in bold and italics added).

87.     Such work included, without limitation, negligent and reckless: (a) mechanical, piping, and other work performed by Defendant ETS; (b) pumps, machinery, and other work performed by Defendant UPS; (c) electrical, instrumentations, and other work performed by Defendant Excel; (d) inspection and other work performed by Defendant Versa; (e) hiring, staffing, and other work performed by Defendant Pinnacle; (f) construction and other work performed by Defendant NIS; and (g) general oversight, supervision, quality check, maintenance work, and sign-off on various aspects of the overall refitting project by the Contractor Defendants.

88.     Within only four days of its reopening, the first of at least four Toxic Incidents would occur at the Refinery, causing massive harm and damages to the surrounding communities and affected residents of St. Croix.

**D.     The Toxic Incidents**

89.     The Toxic Incidents occurred: (a) on February 4, 2021; (b) in late April 2021; (c) on May 5, 2021; and (d) on May 12, 2021, causing harm to Plaintiffs and the Class. Each of the Toxic Incidents was entirely preventable had Defendants not acted negligently and recklessly.

**i.     Toxic Incident One**

90.     On February 4, 2021, only a few days after restarting the Refinery, Toxic Incident One occurred when a flare at the Refinery caused the release of oil to rain down on over a hundred homes, vegetation, and cars in the adjacent neighborhood of Clifton Hill and beyond. Residents noted a "mist of oil" emitting from the Refinery that coated their homes. One media account described the flaring incident as having "spewed a plume of steam and fuel residue into the air, covering more than 130 homes with specks of oil and contaminating the drinking water of more than 60 residents."

91.    According to the EPA, "a mixture of oil and water, in the form of an oily mist, was emitted as air emissions from Flare #8 at the Limetree Bay Facility" (the "Feb. 4 Incident").[30] These emissions included liquid droplets of oil and other toxins. Limetree was certainly aware of the environmental impacts the Feb. 4 Incident had on the surrounding communities and residents, but a press release dated March 3, 2021 issued by Limetree Bay Terminals, LLC, downplayed the incident, stating as follows:

> St. Croix, U.S. Virgin Islands (March 3, 2021) – Last month, Limetree Bay experienced an upset in the refinery at Flare Unit #8. This incident resulted in a release of steam and oil which traveled northwest. The release occurred while Operations was quenching one of the Coke drums, and the quenching operation was stopped to end the release.
>
> Initial investigations did not reveal any impact beyond the refinery's fence line. Once Limetree was made aware that there was impact to the community, our environmental teams were immediately dispatched to neighboring areas to assess that impact.
>
> After further investigation, Limetree's environmental team was able to field verify the area impacted by the release, which was determined to be the Clifton Hill community. While the release did not present a health hazard to the public, Limetree determined that oil droplets were present on some vehicles and roofs in the area, and implemented a plan to clean those roofs and vehicles.
>
> Limetree executed its response plan and began cleaning cars immediately. The response plan included inspection and assessment of cars, roofs and properties, and assisting in disconnecting cisterns from roofs. In addition, Limetree retained a third party to sample cistern water for oil and grease, and this data is being analyzed in an EPA-certified lab in Florida (PACE Lab). To the residents whose cisterns were disconnected, Limetree provided drinking water on a daily basis, which was delivered to their door. Limetree also went door-to-door to all the residents in Clifton Hill and responded to all the complaints received. An area of impact was delineated on a map, and the plan for cisterns is to empty, clean and refill with potable water all cisterns whose lab results show a detection. Residents whose lab results show non-detect, will have their cisterns topped off with potable water.

---

[30] May 14 Order at ¶¶ 34, 37.

> All applicable regulatory agencies were notified at the time of the incident, and Limetree continues to work with both local and federal agency partners to ensure the continued safety of its personnel, the public and environment.[31]

92.     Additionally, the EPA stated, "[a]s of March 16, 2021, Limetree had reported to EPA that the Feb. 4 Incident resulted in 193 residences with potential contamination and 148 roofs and 245 cars that required cleaning. Samples were taken from 163 cisterns, and at the time the results of 135 of those samples had been received. 70 of those 135 cisterns were identified as contaminated."[32]

93.     Many residents in the communities near the Limetree Bay Facility rely on cisterns for their household water use, including because of the prior contamination caused by the earlier owners of the Refinery. A March 21, 2021 news article explained that "[e]ver since the refinery contaminated St. Croix's groundwater [under HOVENSA's prior operation], cisterns have become a necessity on the island—catching rain to provide water for residents to drink, wash with or . . . irrigate their vegetable gardens."[33]

94.     The Limetree Defendants ultimately admitted to the severity of the Feb. 4 Incident, stating that "during an April 30, 2021, site visit to the Facility by staff from EPA…, Limetree representatives said that Limetree believes that the release was a mist with heavy oil in it."[34]

95.     The EPA's analysis revealed that Toxic Incident One could have been caused by the Refinery's "knockout drums" that were "not designed with sufficient capacity."[35]

---

[31] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Response to Flare Incident" (Mar. 3, 2021), available at https://www.limetreebayenergy.com/limetree-bay-response-to-flare-incident/ (last accessed January 17, 2023).
[32] May 14 Order at ¶ 38.
[33] *Id*. at ¶ 38-39.
[34] *Id*. at ¶ 42.
[35] *Id*. at ¶ 44.

96.     The EPA specified that "[t]his type of event is *not common* for a refinery startup."[36]

97.     According to the EPA, "[i]n early April, the Refinery stopped operations for a period of time due to undisclosed operational issues. [Limetree Bay Refining] stated in a letter to EPA that the 'refinery is shut down while we make operational adjustments.'"[37]

98.     Despite the extensive and severe contamination that resulted from the Feb. 4 Incident, residents whose cisterns were impacted were not told of the contamination by the Limetree Defendants for several weeks, and information concerning the extent of the contamination was concealed from residents and the public.

99.     For example, it took the Limetree Defendants two weeks to inform Plaintiff Cotton, who lives just north of the Refinery, that his cistern water had been contaminated by the Feb. 4 Incident. After finally providing Plaintiff Cotton with notice of the contamination, Defendants then attempted to wrongfully induce Plaintiff Cotton (and other Class members) to sign a release of claims that would pay him only $2,000 in exchange for waiving all his legal rights to hold Defendants liable for any bodily harm or property damage relating to the Feb. 4 Incident. Plaintiff Cotton refused to sign the release form.

100.    Any similar release forms that were obtained by the Limetree Defendants, including via its contractor Sedgwick, are legally unenforceable for numerous reasons.

### ii.     EPA Response and Toxic Incident Two

101.    In March 2021, in the wake of the Feb. 4 Incident, the EPA revoked the permit that enabled the Refinery to reopen and announced that it was investigating the incident. The EPA's actions came in response to pressure from environmental and community groups and a recent

---

[36] *Id.* (emphasis added).
[37] *Id.* at ¶ 45.

Executive Order instructing federal agencies to review environmental measures taken by the previous administration.

102.    An EPA representative stated that "withdrawing this permit will allow EPA to reassess what measures are required at the Limetree facility to safeguard the health of local communities in the Virgin Islands, while providing regulatory certainty to the company."

103.    In addition to the March 2021 permit revocation, the EPA took several subsequent actions concerning Limetree's operation of the Refinery and began to investigate the flares that occurred, including with respect to the Feb. 4 Incident, that have released large amounts of sulfuric gases into the air and contaminated residents' properties, air, and drinking water.

104.    For instance, on April 8, 2021, the U.S. Department of Justice, on behalf of the EPA, filed a Motion to Enter the First and Second Modifications to a 2011 Consent Decree which resolved Clean Air Act violations of the Refinery's prior owner, Hovensa, which, among other things, substituted the facility's new owners, Limetree Terminal LLC and Limetree Refining LLC, for Hovensa, and added an environmental response trust.

105.    In addition, on April 1 and April 30, 2021, the EPA issued letters requesting information regarding the startup of certain process units, the Feb. 4 Incident, Title V reporting, other air releases, ambient sulfur dioxide monitoring, and maintenance of certain boilers and process heaters.

106.    Despite the withdrawal of the permit, Defendants chose to continue their oil refining operations at the Refinery, and predictably and foreseeably, given the fact that it was known to Defendants that the Refinery had been idled for years, was undercapitalized, and was in poor condition and not capable of operating correctly, contamination incidents continued to occur.

107.    In late April 2021, Toxic Incident Two occurred.

108.    The Limetree Defendants were undergoing significant personnel changes at this time, as reflected by the fact that on April 19, 2021, Limetree Bay Terminals, LLC issued a press release announcing "that Neil Morgan has been named as Refinery General Manager, effective today. Mr. Morgan succeeds Robert Weldzius, who joined Limetree Bay primarily to lend his deep refining expertise during the Company's early formation and through the restart process."[38]

109.    Between April 19 and April 23, 2021, specifically, "Limetree reported … exceedances for the 162 parts per million ("ppm") emission standard for H2S concentrations … at the facility."[39]

110.    Specifically, on April 23, 2021, another flaring incident released large amounts of sulfuric gases into the air, exposing thousands of St. Croix residents to the released chemicals ("April 23 Incident"). It was later determined that a sulfur recovery unit failed to capture hydrogen sulfide that was at one point 562 times the federally allowed limit.

111.    On April 23, 2021, Limetree Bay Terminals, LLC issued a press release stating:

**Limetree Bay Responding to Site Incident**

ST. CROIX, U.S. Virgin Islands (April 23, 2021) – The Limetree Bay refinery experienced an operating upset overnight and into the early morning hours which created a strong odor detectable outside the facility. Limetree has corrected the problem and will continue to monitor any additional impact to the outside community.

The executive management of Limetree Bay sincerely apologizes for any impact to the public.[40]

---

[38] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Names Neil Morgan as Refinery General Manager" (Apr. 19, 2021), available at https://www.limetreebayenergy.com/limetree-bay-names-neil-morgan-as-refinery-general-manager/ (last accessed January 17, 2023).
[39] May 14 Order at ¶ 46.
[40] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Responding to Site Incident" (Apr. 23, 2021), available at https://www.limetreebayenergy.com/limetree-bay-responding-to-site-incident/ (last accessed January 17, 2023).

112.    The U.S. Virgin Islands Department of Planning and Natural Resources initially stated that the smell associated with the flare was due to "an exceedance of hydrogen sulfide" at the Refinery. In high concentrations, both sulfur dioxide and hydrogen sulfide can be harmful and even deadly to humans and can cause eye irritation, difficulty breathing, and comas.

113.    As a result of the April 23 Incident, multiple St. Croix schools and businesses were forced to shut down, and U.S. Virgin Islands officials issued stay-indoors orders. Further, St. Croix's Covid-19 vaccination center was even forced to close.

114.    The EPA stated, "H2S is a flammable, colorless gas that smells like rotten eggs. People can usually smell H2S at low concentrations in air when H2S concentrations are in the range of from 0.0005 to 0.3 ppm. Exposure to low concentrations of H2S may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of H2S."[41]

115.    From April 19-22, 2021, "hydrogen sulfide concentrations measured at the Flare #8 flare header rose to orders of magnitude above the limit of 162 ppm … High hydrogen sulfide readings on each of those four days, measured between 5 AM on April 19 and 5 PM on April 22, rose as high as 31,546.5, 39,475.7, 2,272.4, and 4,046.5 ppm, respectively[.]"[42]

116.    Additionally, "Limetree continued to measure high levels of hydrogen sulfide in excess of the 162 ppm limit at the flare header for Flare #8 at the Facility during the evening of April 22 and into April 23, 2021. Hydrogen sulfide readings rose throughout the evening on April 22, 2021 and peaked at a three-hour average of 91,649.0 ppm around 11 AM on April 23—over 565 times higher than the concentration limit of 162 ppm."[43]

---

[41] May 14 Order at ¶ 47.
[42] Id. at ¶ 49.
[43] Id. at ¶ 51.

117.    In addition to the H2S release, the EPA confirmed the presence of "emissions plumes,"[44] which makes it highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water.

118.    On April 24, 2021, the Virgin Islands Department of Health ("VIDOH") issued a press release alerting St. Croix residents to potential health effects from the Facility's Refinery emissions:

> ### VI Government Alerts St. Croix Residents About Potential Health Effects Caused By Refinery Emissions
>
> St. Croix, US Virgin Islands (April 24, 2021)— Commissioner Jean-Pierre L. Oriol of the Department of Planning and Natural Resources (DPNR) advises the community that the department has confirmed that there were elevated concentrations of H2S (Hydrogen Sulfide) in the No. 8 flare header at the Limetree Bay Facility. The department is in close communications with the facility, and an investigation is ongoing to determine necessary corrective measures.
>
> This foul, gaseous smell, which can smell similar to rotten eggs, has permeated throughout the Frederiksted area for the past few days.
>
> Health Commissioner Justa Encarnacion, RN, added, "any potential threat to the health of the public is always a concern of mine. As DPNR continues to monitor environmental effects, I encourage you to report symptoms like headaches, nausea, and especially those of a respiratory nature to your healthcare provider."
>
> According to the Agency for Toxic Substances and Disease Registry, hydrogen sulfide can have mild to severe health impacts. Studies in humans suggest that the respiratory tract and nervous system are the most sensitive targets of hydrogen sulfide toxicity.
>
> Exposure to low concentrations of hydrogen sulfide may irritate the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to extremely high concentrations of hydrogen sulfide.
>
> Exposure to low concentrations of hydrogen sulfide may cause headaches, poor memory, tiredness, and balance problems. Brief exposures to high

---

[44] *Id*. at ¶ 62.

concentrations of hydrogen sulfide can cause loss of consciousness. In most cases, the person regains consciousness without any other effects. However, some individuals may have permanent or long-term effects, such as headaches, poor attention span, poor memory, and poor motor function.

Individuals with respiratory ailments such as allergies, lung disease, or asthma should consider taking protective actions such as staying indoors or temporarily relocating to areas less affected.

The Department of Planning and Natural Resources (DPNR) and the Department of Health will monitor this situation and advise the community accordingly. If you have any questions or concerns, please call DPNR at (340) 773-1082 ext. 2221 or Environmental Health division at (340) 718-1311 ext. 3709.[45]

119.    The VIDOH's press release specifically noted the potential physical health effects resulting from breathing hydrogen sulfide and encouraged residents to report symptoms such as headaches, nausea, and symptoms of a respiratory nature to their healthcare providers.

120.    That same day, on April 24, 2021, Limetree Bay Terminals, LLC issued a press release falsely downplaying the incident and denying that any release of hydrogen sulfide occurred from April 22 to 23, 2021. The press release falsely claimed that the incident involved only an unusually high level of sulfur dioxide emissions, and that the odor of sulfur dioxide (similar to a struck match) can be smelled in amounts far below the level normally considered dangerous to health. The text of this press release is below:

**Limetree Continues to Investigate Flare Incident; Clarifies Media Reports**

ST. CROIX, U.S. Virgin Islands (April 24, 2021) – Late evening April 22nd through the morning of April 23rd, the refinery experienced an operating upset in the sulfur processing part of the refinery. Limetree investigated and determined that this upset caused a pressure increase in some equipment, resulting in the opening of a pressure relief valve, and sending an unusually

---

[45]Press Release, United States Virgin Islands Department of Health, "VI Government Alerts St. Croix Residents About Potential Health Effects Caused By Refinery Emission" (Apr. 24, 2021), available at https://doh.vi.gov/news/vi-government-alerts-st-croix-residents-about-potential-health-effects-caused-refinery (last accessed January 17, 2023).

high amount of sulfur-containing gases to the flare, where they were safely burned. The pressure relief valve and flare are designed to work this way to protect the refinery workers and community.

When the sulfur-containing gases burned in the flare, sulfur dioxide was produced. This unusually high level of sulfur dioxide coming from the flare unfortunately resulted in an odor that was evident to parts of the neighboring community. Sulfur dioxide has an odor similar to a struck match and can be smelled even at a very low concentration level, which is far below the level normally considered dangerous to health.

The refinery workers took action to correct the upset condition, which eliminated the source of the bad odor by late morning April 23rd. After a few more hours, all traces of the odor dissipated on Friday.

We would further like to clarify that the refinery did not experience a gas leak of hydrogen sulfide during this incident, as some media reports indicated. Hydrogen sulfide was a component in the gases that were safely burned in the flare, generating the sulfur dioxide that resulted in the odor.

The executive management of Limetree Bay sincerely apologizes on behalf of the entire organization for the unpleasant odor that came from the refinery yesterday and for its impact on our neighbors and the community. We are committed to investigating fully the reasons for this event in cooperation with local regulators, and to implement improvements to prevent it from happening again.

For more information or to report an issue, please contact the Limetree Bay Command Center at (340) 692-3000.[46]

121.   During an April 30, 2021 site visit to the Limetree Bay Facility by staff from EPA and other regulators, "Limetree staff explained that the April 23, 2021 incident was related to the main sulfur recovery unit #4's fire eye detecting a lack of flame, and thus diverting the acid gas to the flare rather than treating it. The flare itself had a flame burning at the time that would have burned the hydrogen sulfide, producing sulfur dioxide."[47]

---

[46] Press Release, Limetree Bay Terminals, LLC, "Limetree Continues to Investigate Flare Incident; Clarifies Media Reports" (Apr. 24, 2021), available at https://www.limetreebayenergy.com/limetree-continues-to-investigate-flare-incident-clarifies-media-reports/ (last accessed January 17, 2023).
[47] May 14 Order at ¶ 58-60.

122.     According to the EPA, "Limetree also does not conduct any fenceline monitoring for SO2 or H2S; it only conducts fenceline monitoring for benzene. Limetree's predecessor, HOVENSA, operated five SO2 monitors near the perimeter of the Facility, but those monitors have not been operated since 2013, after HOVENSA stopped operating the Facility's Refinery. Limetree has not restarted those SO2 monitors. On April 30, 2021, EPA issued a Notice of Violation to Limetree for its failure to operate the five SO2 monitors."[48]

### iii.     Toxic Incident Three

123.     The upheaval in major personnel changes among leadership at the Refinery continued in early May 2021, with the replacement of Forgan McIntosh, the Chief Financial Officer ("CFO"), with Steve Tompsett, as described in a press release issued by Limetree Bay Terminals, LLC, stating that Tompsett would become the CFO of an entity called Limetree Bay Energy, pursuant to the press release appearing to encompass Limetree Bay Refining and Limetree Bay Terminals.[49]

124.     On May 5, 2021, Toxic Incident Three occurred when the Refinery experienced yet another severe incident that tragically affected the surrounding communities, including thousands of St. Croix men, women, and children. This time, a "gaseous leak" resulted in at least 200 known reports from residents complaining of the odor and serious health effects including "[n]ausea, vomiting, stomach aches, itching, irritated eyes, and rash" (the "May 5 Incident").

---

[48] *Id.* at ¶ 66.
[49] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Appoints New Chief Financial Officer" (May 3, 2021), available at https://www.limetreebayenergy.com/limetree-bay-appoints-new-chief-financial-officer/ (last accessed January 17, 2023).

125.    While St. Croix does not currently have a fully operational hospital, at least nine residents visited emergency rooms because of the May 5 Incident. Many others sought treatment from private providers.

126.    In addition, local schools were forced to shut down and send children home for the second time in less than a month.

127.    According to the EPA, "[o]n May 5, 2021, community members began calling EPA to report that an odor was emitting from the Facility. They described the odor as 'sulfur,' 'gassy,' 'burnt eggs,' and 'rotten.' On May 6, 2021, community members continued to report odor emitting from the Facility. At 7:08 PM est, a citizen caller reported that the odor was continuing and described the fumes as 'noxious.' The caller also stated that the 'materials in the air were causing health problems' for community members, including 'head ache, sore throat, ear ache, nausea, and lips and tongue tingling.'"[50]

128.    Despite these warnings, on May 5, 2021, Limetree issued an initial statement on Facebook again falsely "denying that there were any problems at the Facility." Limetree stated in its Facebook post that Facility personnel had conducted a preliminary investigation, and Limetree had concluded that "units are operating normally, and there is no activity that would result in an odor."[51]

129.    Subsequently, Limetree admitted to environmental violations on the very same day that they misled the public.

130.    Per the EPA, "On May 5, 2021, Limetree environmental personnel reported to DPNR and EPA that the Facility had exceeded the H2S limit at Flare #8 at approximately 9 PM

---

[50] May 14 Order at ¶ 69.
[51] Id. at ¶¶ 69, 71.

est on May 5. At the time the email notification was sent to DPNR and EPA at 10:12 PM est, Limetree environmental personnel stated that H2S was back below the limit."[52]

131.   On May 6, 2021, Defendants released the following statement again falsely downplaying the incident: "Limetree Bay has become aware of an odor affecting areas west of the facility. We are conducting maintenance activity at the Coker unit, which has resulted in light hydrocarbon odors. We will continue to monitor the situation, but there is the potential for additional odors while maintenance continues. We apologize for any impacts this may have caused the community. Thank you."[53]

132.   That same day, on May 6, 2021, due to the noxious odors released by the Refinery, the U.S. Virgin Islands' Bureau of Motor Vehicles closed due to the presence of a "gas like odor."[54] On the same day, the Virgin Islands' Department of Education closed three schools.[55]

133.   On May 7, 2021, Virgin Islands governor Albert Bryan "activated the … National Guard … to address continuing reports of odor and heightened concern from the community."[56] The government "advised residents with respiratory ailments to avoid going outside or to temporarily relocate to areas of the island that were less affected by the odors."[57]

134.   On May 7, 2021, the Limetree Defendants reported to the EPA that yet another spike of H2S was released into the environment as a result of the Refinery and Defendants' operations thereof.[58]

---

[52] *Id.* at ¶ 72.
[53] *Id.* at ¶ 73.
[54] *Id.* at ¶ 76.
[55] *Id.* at ¶ 75.
[56] *Id.* at ¶ 77.
[57] *Id.*
[58] *Id.* at ¶ 78.

135.   Because of the visible plume, it is highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water.

136.   On May 9, 2021, Limetree Bay Terminals, LLC issued another press release, stating:

> **Limetree Bay Continues to Work with Government to Identify Odor**
>
> ST. CROIX, U.S. Virgin Islands (May 9, 2021) – Limetree Bay Refining, LLC ("Limetree Bay" or the "Company") continues to work with local and federal regulators to determine the source of recent odors affecting areas in the western part of St. Croix.
>
> In response to community concerns and to support efforts by the U.S. Virgin Islands Government to identify the source of recent odor complaints, industrial hygiene specialists at Limetree Bay conducted air monitoring beginning Friday and continuing through Saturday evening at five locations immediately to the West and Northwest of the refinery. This air monitoring detected zero concentration of hydrogen sulfide, zero concentration of sulfur dioxide and zero concentration of hydrocarbons. The results of this monitoring have been shared with the Department of Planning and Natural Resources (DPNR).
>
> Limetree Bay remains committed to cooperating fully with the local and federal government to identify the source of the odor and will work to immediately address any findings identified from the odor investigation that are attributable to the refinery.[59]

### iv.   Toxic Incident Four

137.   On May 12, 2021, Toxic Incident Four occurred and included a release of oil droplets throughout the surrounding neighborhoods and communities downwind of the Refinery.

138.   According to the EPA, "[o]n May 12, 2021 at approximately 5:30 PM, Limetree reported to EPA that around 3:15 PM EST a flaring incident occurred at the Refinery when the

---

[59] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Continues to Work with Government to Identify Odor" (May 9, 2021), available at https://www.limetreebayenergy.com/limetree-bay-continues-to-work-with-government-to-identify-odor/ (last accessed January 17, 2023).

pressure in the coker drum rose, causing fire or flames. At the time, Limetree was still unsure what specifically caused the flaring incident. Limetree reported that during its investigation of the fire, Limetree discovered that liquid droplets of oil were on the road west of the Facility."[60] "Liquid droplets of oil" were also reported on properties in the surrounding neighborhood.[61]

139.   Additionally, "[a]t 8:50 PM on May 12, 2021, Limetree staff told EPA staff by telephone that Limetree was stopping production after such a "big" incident. This would not be a full shutdown of the Refinery, but Limetree would stop production. Limetree would run some units on circulation and the utilities/wastewater would still be in operation. The Limetree staff was not sure how long production would be suspended."[62]

140.   The EPA once again indicated that "this type of event—let alone two such events in a few months—is *not common* for a refinery startup."[63]

141.   Limetree Bay Terminals, LLC issued a press release dated May 12, 2021, stating, in pertinent part:

> **Limetree Bay Responding to Flare Incident**
> St. Croix, U.S. Virgin Islands (May 12, 2021) – On Wednesday, Limetree activated its Incident Command in response to an upset in the refinery at Flare Unit #8. This incident resulted in a release of oil droplets which traveled directly west.
>
> Preliminary investigations have revealed that there has been an impact to the Enfield Green community, as well as some industrial sites. Residents in Enfield Green are asked to disconnect downspouts to cisterns if accessible. Residents are also asked not to consume the water. Water distribution will be established for affected communities.
>
> In response to today's incident, Limetree Bay has decided to temporarily suspend production activities until further notice. All processing units will be brought to a safe, stable condition.

---

[60] May 14 Order at ¶ 79.
[61] *Id.*
[62] *Id.* at ¶ 84.
[63] *Id.* at ¶ 89 (emphasis added).

Limetree will continue to assess the impact and advise if additional neighborhoods are affected. If you think you may have been impacted by the release, please contact Limetree's Incident hotline at (340) 692-3199.

All applicable regulatory agencies were notified at the time of the incident, and Limetree's top priority is the safety and well-being of its personnel, the community and environment.[64]

142.   The EPA called the May 12 Incident "a serious incident that led to exceedance of the emission limit for sulfur dioxide, a toxic gas."

143.    In the wake of the May 12 Incident, the Virgin Islands Territorial Emergency Management Agency warned residents about a "gaseous odor" and urged those with respiratory illnesses to stay inside.

144.   Limetree Bay Terminals, LLC issued another press release dated May 13, 2021, the following day, stating the cause of Toxic Incident 4, stating:

**Limetree Bay Continues Flare Incident Investigation**

Company dispatches field teams *to assess Community Impact*

St. Croix, U.S. Virgin Islands (May 13, 2021) – Limetree Bay continues to investigate Wednesday's flaring incident and assess the condition of the refinery's equipment. *Upon further investigation, it was determined that the flaring incident was caused by an upset at the Coker unit*.

As of noon Thursday, production at all of the process units were discontinued, and Limetree is nearing completion to bring them to a safe, stable condition.

Limetree deployed teams to several communities west of the facility to assess the impact of Wednesday's release, and field representatives have begun information gathering and property inspections. *Thus far, investigations have revealed there are scattered impacts to neighborhoods as far west as Estate Whim*.

---

[64]Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Responding to Flare Incident" (May 12, 2021), available at https://www.limetreebayenergy.com/limetree-bay-responding-to-flare-incident/ (last accessed January 17, 2023).

> ***Residents who may have been affected by the oil release are reminded not to consume the water from their cisterns***. Daily water distribution has been established for affected communities.
>
> Limetree sincerely apologizes for the impact this has caused the community and will continue to assess the impact and advise if additional neighborhoods are affected. If you think your property may have been impacted by the release, please contact Limetree's Incident hotline at (340) 692-3199.[65]

145.   Limetree Bay Terminals, LLC issued yet another press release dated May 18, 2021, stating that operations at the Refinery had been suspended:

> **Limetree Bay Confirms Refinery Operations Suspended**
>
> St. Croix, U.S. Virgin Islands (May 18, 2021) – Limetree Bay Energy ("Limetree Bay" or the "Company") is aware of persistent odor complaints across St. Croix and would like to reaffirm that the refinery has ceased operating.
>
> Limetree Bay immediately suspended operations after last Wednesday's flare incident, which resulted in a release of oil to several Frederiksted neighborhoods, and all refining had been discontinued by Thursday morning. …
>
> The Company would like to assure residents that the refinery's shutdown activities are not likely to cause such widespread odors detectable outside of the facility. Limetree Bay will continue to cooperate with the EPA and local regulators to identify and address the source of any odor attributable to refinery activities.
>
> Residents who think their property may have been impacted by the recent release should contact Limetree Bay's Incident Hotline at (340) 692-3199.[66]

---

[65] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Continues Flare Incident Investigation" (May 13, 2021), available at https://www.limetreebayenergy.com/limetree-bay-continues-flare-incident-investigation/ (last accessed January 17, 2023) (emphasis in bold and italics added).

[66] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Confirms Refinery Operations Suspended" (May 18, 2021), available at https://www.limetreebayenergy.com/limetree-bay-confirms-refinery-operations-suspended/ (last accessed January 17, 2023).

### v.       Plaintiffs and the Class Were Devastated by the Toxic Incidents

146.    The Toxic Incidents at the Refinery, which were purposefully, falsely, and massively understated in the press releases issued by the Limetree Defendants, in fact caused a severe, ongoing, and well-documented human health crisis in St. Croix, in that the actions of Defendants and the Refinery poisoned the environment, homes, real property, gardens, vegetation, soil, personal property, water, cisterns, and plumbing systems of Plaintiffs and the Class, and exposed them to hazardous, toxic, and carcinogenic material that can and has caused serious bodily injury and/or death.

147.    The Toxic Incidents have had and continue to have a far-reaching impact on the people living and working near the Limetree Bay Refinery, the majority of whom are Black, Brown, or Latino, and many of whom are poor.

148.    At a virtual town hall meeting held on May 13, 2021, St. Croix resident ChenziRa Davis-Kahina stated emphatically, "[o]ur children are suffering. This is becoming uncomfortable to a point that we have to put out a hashtag like, 'We can't breathe.' We have to put out hashtags like, 'Stop killing us.' We have to put out hashtags to get people to hear what's happening here in a place that's supposed to be America's paradise."

149.    Jennifer Valiulis, who directs the St. Croix Environmental Association, underscored the effect of the Toxic Incidents on the local community and the need for immediate action stating, "[l]ately we are seeing incidents happening nearly daily with this refinery: Fires, flares, spills, noxious emissions, oil raining down into neighborhoods. Each one of these events has impacted our community in disastrous ways — severe illness, loss of food, loss of drinking water. At some point, we need to say that enough is enough and demand accountability from Limetree."

150.    Plaintiffs and Class members were desperate for answers and relief. The St. Croix Environmental Association noted "[w]e are receiving more and more calls each day from people that are frustrated with the lack of information and desperate for some relief from the air pollution that is making them sick."

151.    According to Frandelle Gerard, a local business leader and the executive director of the Crucian Heritage and Nature Tourism Foundation, "People are suffering, hospital admissions are up, and we don't know how long this will continue."

152.    As a result of the Toxic Incidents, in addition to the substantial economic harms that arise from the need for massive remediation of the pollution caused by the Refinery, as detailed above, including, without limitation, the cleaning of all affected roofs, cisterns and plumbing systems to assure the delivery of safe water, Plaintiffs and many Class members also suffered personal injuries including, for example, loss of consciousness, death, becoming bedridden, suffering from swelling, stabbing pain and irritation of the eyes, a burning sensation in the nose and on the tongue, sore throat, nausea, vomiting, upset stomach, diarrhea, nose bleeds, rashes, fatigue, uncontrollable coughing, shortness of breath, chest pains, dizziness, headaches, discomfort from unsettling odors, sleeplessness, difficulty sleeping, aggravation of preexisting respiratory conditions and stress, mental anguish, anxiety and depression resulting from their experience and fear concerning the long-term health implications of their exposure to the Toxic Contaminants.

153.    Many Class members, including children, were hospitalized or sought medical care from clinics on St. Croix, and some residents even had to leave St. Croix to seek additional health care.

154.     In issuing its May 14 Order, the EPA noted the significant health impact that exposure to certain Toxic Contaminants could have on the affected Class members of St. Croix. In particular, with respect to hydrogen sulfide, exposure to even low concentrations is known to cause irritation to the eyes, nose, or throat and may cause difficulty in breathing for some asthmatics. People exposed to high concentrations of hydrogen sulfide can suffer respiratory distress or arrest and neurological effects.

155.     Similarly, exposure to very high levels of sulfur dioxide is considered immediately dangerous to life and health. In addition, burning of the nose and throat, breathing difficulties, and severe airway obstructions may occur.

156.     Moreover, the oil released by the Toxic Incidents is composed of hydrocarbons. Adverse health impacts have been associated with the inhalation or ingestion of, or dermal contact with, petroleum hydrocarbons or residue or water effected by petroleum hydrocarbons. Short-term exposures have caused skin and eye irritation, while longer term oral exposures have shown liver effects. In addition, some oil constituents have been classified as known or possible carcinogens.

157.     Making things far worse, thousands of Class members still do not have access to adequate clean and safe water at their homes to survive.

158.     In the days, weeks, and months that followed the Toxic Incidents, Class members discovered that their homes, cisterns, gardens, vegetation, cars, and other personal property were contaminated with oil and other Toxic Contaminants. Specifically, Plaintiffs and Class members, and their property, were unnecessarily exposed to Refinery Contaminants because of Defendants' failure to operate the Refinery responsibly and lawfully. In addition, Plaintiffs and Class members were also subjected to unreasonable odors, gases, vapors, and fumes because of Defendants' conduct in operating the Refinery.

159.    The Toxic Contaminants resulting from Defendants' operations at the Refinery, as well as the odors, gases, vapors, and fumes, impacted Plaintiffs' and Class members' properties and property values, are a blight and nuisance on Plaintiffs' and the Class members' communities, and have deprived Plaintiffs and Class members of their free use and enjoyment of their property.

160.    In particular, cisterns are used on St. Croix to catch and store rainwater to use for drinking, bathing, washing dishes, brushing teeth, feeding livestock, and watering crops, plants, and vegetation.

161.    Following the Toxic Incidents, Plaintiffs and the Class observed a distinctive sheen on the surface of their cistern water, felt an oily residue on their skin after bathing, and noted the strange taste that their cistern water now has. They have also lost crops and watched their livestock die due to the Toxic Contaminants.

162.    Over 17,000 cisterns are located within the geographic zone impacted by the Toxic Incidents, including over 11,000 residences that have a cistern as the only source of clean water and over 5,000 residences that have a cistern and also access to public water for supplemental or emergency needs.

163.    Many Class members are poor and do not have the money to remediate the pollution from the Toxic Incidents. Many families impacted by the pollution and contamination have been forced to shower at the homes of friends or relatives that live outside the affected geographic area and have been forced to use laundromats for washing clothes. Some residents are forced to wash their clothes in the contaminated water because it is prohibitively expensive and time-consuming to do otherwise. Class members have had to buy bottled water to drink and cook with ever since the discharges. In short Plaintiffs and the Class have been unable to access clean and safe water to secure the basic necessities of their daily lives. This has gone on for nearly two years with no end in sight, as Defendants have utterly failed to remediate the problems that they caused, notwithstanding the availability of insurance.

164.    Underscoring the seriousness of the conditions faced by Plaintiffs and the Class, following the Toxic Incidents, researchers from Bennington College in Vermont conducted a Community Impact Survey of area residents. Based on the survey, the researchers concluded that every neighborhood west and north of the Refinery was impacted by the Toxic Incidents, and the impacts of these events were particularly severe in predominantly low-income Black and Brown neighborhoods downwind of the Refinery.[67] A review of just some of the survey responses lays bare the devastating impact on the community's health and property that resulted from the Toxic Incidents.[68] The summary of findings from the Bennington College researchers include, for example:

> **SUMMARY OF FINDINGS**
>
> Community Impact Survey was conducted June 17 to July 11, 2021 and elicited 681 responses from 120 different neighborhoods in St. Croix, US Virgin Islands.

[67] Bennington College, *Environmental Justice Begins in St. Croix*, available at https://www.bennington.edu/center-advancement-of-public-action/environment-and-public-action/environmental-justice-begins-st (last accessed January 17, 2023).

[68] *See id.* ("There was a period leading up to the time when the refinery closed where every single day was difficult to breathe. It was as if we were inhaling oil with each breath." (resident of **Frederiksted**); "The inside of our home was filled with visible dense 'fog' that hung on everything." (resident of **Whim**); "In April I was affected by the smell of oil and sulfur that caused headaches and nausea, In May, specifically May 12th and 13th, the smell was overwhelming causing me to cough, have severe headaches and difficulty breathing. Because I live in Whim, it affected me at night but during the day at my work in downtown Frederiksted, it was even more severe." (resident of **Whim**); "Our cistern has been contaminated, and multiple people in our house have thrown up from the gaseous fumes." (resident of **Williams Delight**); "There has been a nauseating and noxious sulphuric smell in the area. The smell has been impacting myself and my family, making our eyes, noses, and throats burn. In addition to this it causes dizziness and makes it hard to breathe. Our cistern water has been impacted and following an episode of rain that followed a flaring event, there were gelatin-like black globs in our water. We can no longer use our water for cooking or brushing our teeth. The water irritates my daughter's skin, who is affected significantly because she is allergic to sulphur. I am a farmer and I am concerned about my crops and my animals. I now have to purchase water, sometimes several times weekly, for uses that normally I would use my cistern water for." (resident of **Williams Delight**); "Headaches, nausea, vomiting at times, difficulty breathing, lethargic. My 2 dogs and cat have also been impacted too, very lethargic at times, runny eyes, itchy skin. I had to bring them inside. When the refinery was fully operation something was going on between 1 am and 3 am, I would be awaken with coughing and gagging, and a severe headache. My sinus would also be irritated. I would have to wash my face with cold water and rinse my nostrils out for relief. On occasion I had to use my inhalant." (resident of **Adventure Hill**); "We experienced dizziness and nausea. I was light headed and generally ill. Once it rained, it intensified the smell and I was going to pass out. We had to cover our faces with towels just to be able to walk around. My cat experienced diarrhea and irregular symptoms that day that I believe are an effect of the poisonous gas." (resident of **Frederiksted**); "Strong vapors that caused headache, sore throat, tight chest, coughing. Even the animals were having symptoms." (resident of **Mars Hill**); "The kids lay on the ground in my room complaining about headaches and stomach pain. They do not want to go outside whenever it's happening. I also do a lot of fishing and can only imagine how much is getting in the ocean. Fishing from shore has been terrible like nothing is there." (resident of **Two Williams**); "I woke up in the middle if the night coughing. My throat was sore. I tried to breathe through my pillow. A strong metallic odor prevailed early around 4 a.m. My trees leaves turned yellow along with the fruit. Some fruit had black spots. The water in my toilet bowl from the cistern has black sediment on the bottom." (resident of **Whim**).

Every neighborhood downwind of Limetree reported significant impacts to health and environment. Many of these impacts have not previously been reported.

Impacts were severe in predominantly low-income Black and Brown neighborhoods that line the northwest side of the refinery.

95% of responses from frontline neighborhoods reported frequent noxious smells from Limetree Refinery.

Over 70% of responses from downwind neighborhoods reported trouble breathing during Limetree emission episodes.

143 households reported cisterns contaminated by Limetree emissions.

Over 100 households reported gardens and farms damaged by emissions.

67 residents sought medical assistance during emission episodes.

This survey also uncovered 3 untimely deaths that family members attribute to toxic emissions from Limetree.

97% of responses believe the refinery should be required to operate a state-of-the-art air monitoring system before restarting.

90% of residents polled believe EPA should have a full-time employee at Limetree.

80% of residents polled do not trust Limetree to disclose environmental problems.[69]

165.     Indeed, the Toxic Incidents affected practically the entire western half of St. Croix. Soil samples taken from areas west of the Refinery were found to be highly contaminated, while those taken from areas east of the Refinery were not. Similarly, cistern drinking water samples taken from areas west of the Refinery (*i.e.*, downwind), were found to be contaminated with oil-range (C28 – C40) petroleum hydrocarbons also deposited by the Toxic Incidents. Such a compound was not found in samples taken from the area east of the Refinery.

**Plaintiff Beecher Cotton's Allegations**

166.    Plaintiff Cotton is a citizen of St. Croix and a homeowner who lives approximately one half-mile from the Refinery.

167.    On February 4, 2021, Cotton was at his home when he saw flames and heard extremely loud noises coming from the Refinery.

168.    In early March 2021, a friend who worked at the Refinery suggested that Cotton check his home's roof for oil. When he checked his roof, Cotton discovered that it was covered with droplets of oil. In addition, Cotton also found oil on his car parked outside his home.

169.    Approximately two weeks after the February 4 Incident, representatives from the Refinery came to Cotton's home and, in an apparent effort to remove the oil contamination, washed his car, disconnected his gutters, and pressure washed his roof. They also discovered oil in Cotton's cistern used to obtain water to shower and feed his sheep. Cotton believes that the oil may have seeped into the sealant and concrete around his cisterns. After a Limetree Bay Facility representative rejected Cotton's request to have his cisterns retested, Cotton had the cisterns drained and cleaned.

170.    Oil and Toxic Contaminants seeped into Cotton's soil as a result of the Toxic Incidents. This is particularly concerning to Cotton because he grows fruit and avocadoes on his property that he trades with his neighbors.

171.    Following their inspection and ineffective attempt to remediate the damages to Cotton's property, a representative from the Refinery attempted to convince Cotton to sign a release of all legal claims relating to the Toxic Incidents (including bodily harm and property damage) in exchange for $2,000. Cotton refused to sign the release.

172.     In addition to the contamination of his property, Cotton suffered physical injuries resulting from the Toxic Incidents. In particular, Cotton asserts that the hydrocarbons emitted from the Refinery produced a terribly foul smell that caused his eyes to water severely and become extremely itchy for two to four days. Cotton's eyes were swollen shut, his face became red, and he was bedridden as a result of his reaction to the Toxic Incidents. In addition, Cotton also suffered from lack of sleep, stress, and other psychological damage as a result of loud noises coming from the Refinery in the middle of the night.

173.     In addition, due to his proximity to the Refinery he has great concern and fear about the condition of the Refinery and the potential for ammonia and other chemical leaks or fires at the Refinery.

174.      The effects of Defendants' conduct is not simply confined to Cotton's home and person. The impact of the Toxic Incidents, including extensive sulfuric gases, was felt as far away as Frederiksted, nearly ten miles from the Refinery. Thousands of people had their lives turned upside down by the Toxic Incidents, as evidenced by repeated school and business closures and disruptions, widespread real and personal property damage, and increased admissions at local hospitals of people suffering from the health effects of Defendants' conduct.

**Plaintiff Pamela Colon's Allegations**

175.     Plaintiff Colon is a citizen of St. Croix, and on May 13, 2021, was called by the Virgin Islands Bureau of Motor Vehicles ("BMV") to pick up her REAL ID.

176.     Colon drove past the Refinery on her way to the BMV because the public was informed that refining operations had ceased.

177.     Colon understood this to mean that there would be no more releases of pollutants into the air, and it would be safe to drive to the western part of the island where the BMV is located.

178.    As Colon approached the vicinity of Gertrude's restaurant—located near the Refinery, she began to smell a metallic scent, and both of her eyes started to water and become itchy.

179.    As Colon headed further west past the Refinery, she experienced a sharp stabbing pain behind her left eye and starting coughing.

180.    Colon's coughing worsened and became uncontrolled, and she began to feel nauseous.

181.    Colon, who has asthma, parked at the BMV, and immediately used her Ventalin and Flovent inhalers.

182.    Colon entered an air-conditioned area at the BMV, and her symptoms temporarily abated except the watery eyes.

183.    On her way back home, heading east, Colon took another route, Queen Mary Highway, hoping to escape the symptoms she experienced.

184.    However, while heading east, despite not smelling anything, she again became nauseous and experienced itchy and watery eyes as she approached the La Reine Shopping Center.

185.    Colon experienced physical symptoms much worse than before, and the stabbing pain behind her left eye was unbearable. Her face also became swollen.

186.    Colon had to immediately go home to remove and wash her clothes and take a shower.

187.    It took approximately twenty-four (24) hours before Colon was able to experience some relief from her physical symptoms, and she suffers stress and emotional distress from the experience and the worry of long-term health impacts.

**<u>Plaintiff Sirdina Isaac-Joseph's Allegations</u>**

188.    Plaintiff Isaac-Joseph is a citizen of St. Croix and a homeowner who lives downwind from the Refinery in the Mount Pleasant, Fredricksted neighborhood.

189.    For weeks, Isaac-Joseph experienced watery and itchy eyes, shortness of breath, headaches, and nausea because of the foul odors released into the air from the Refinery.

190.    Isaac-Joseph, who suffers from asthma, had to use her Albuterol inhaler more than usual.

191.    Some days the foul smell was so bad that Isaac-Joseph had to leave her home and head eastward to escape, sometimes for several hours.

192.    When she returned home, she had to close all windows and doors and run the air-conditioning, which caused her to incur increased electrical costs.

193.    Isaac-Joseph is a teacher who, during the time period of the Toxic Incidents, was teaching her students remotely. On more than one occasion, Isaac-Joseph was forced to leave home, head east away from the noxious odor, and use her cell phone to continue to teach her students.

194.    Isaac-Joseph noticed a black substance appearing to be oil residue on her roof and cars, which needed to be remediated.

195.    In addition, she lives in close proximity to the Refinery and is in distress and fear due to the potential for ammonia and other toxic leaks or fires that could be catastrophic.

196.    In addition to her physical symptoms, Plaintiff Isaac-Joseph suffers from stress and emotional distress from her experience and the worry of long-term health impacts from the Toxic Incidents.

**Plaintiff Esther Clifford's Allegations**

197.    Plaintiff Clifford is a citizen of St. Croix and owns her residence at 128 Estate Diamond.

198.    Clifford is retired and home most of the day and, for weeks, experienced burning inside her nostrils, itchy, watery eyes, and headaches because of the foul odor arising from the Refinery.

199.    Clifford had to buy air purifiers, Odo Ban spray, and Lysol to alleviate the foul and horrible smell resulting from the Refinery.

200.    Clifford also experienced a dark, brown mist on her house, cars, and in her yard.

201.    Representatives from the Refinery came to Clifford's residence and informed her that the mist was oil.

202.    A representative who identified himself as "Victor" walked around Clifford's property and took pictures.

203.    Another representative who identified himself as "Tony" filled out a questionnaire that asked for Clifford's name, email address, mail address, and telephone number.

204.    "Tony" informed Clifford that he would submit his report to the necessary individuals and someone else would contact her, but no one did.

205.    For a period of time, representatives from the Refinery delivered cases of water for Plaintiff to use because her water supply was contaminated with oil.

206.    Because of her proximity to the Refinery she lives in fear and distress of a catastrophic discharge of toxic chemicals or fires erupting at the Refinery.

207.    In addition to her physical symptoms, Clifford suffers from stress and emotional distress from her experience and the worry of long-term health impacts resulting from the Toxic Incidents.

### Plaintiff Sylvia Browne's Allegations

208.    Plaintiff Browne is a citizen of St. Croix and owns her residence at 18 Clifton Hill, where there are two homes on the property.

209.    Browne experienced nausea, upset stomach, and fatigue as a result of the Toxic Incidents, and was forced to leave her home many times to escape the foul and noxious odors arising from the Refinery.

210.    Representatives from the Refinery inspected Browne's home and found oil on the roof, cars, and in the cistern.

211.    The presence of oil was so extensive that in an apparent effort to remove the oil contamination, the representatives from the Refinery attempted to clean the roof and walls outside both houses on the property. They also emptied both cisterns, cleaned them, and refilled them with water.

212.    Browne also suffered damage to her fruit trees located in her yard, and to her real property.

213.    Because of her proximity to the Refinery she lives in fear and distress of catastrophic discharges or fires at the Refinery

214.    In addition to her physical symptoms, Browne suffers from stress and emotional distress from her experience and the worry of long-term health impacts resulting from the Toxic Incidents.

**<u>Plaintiff Alvina Jean-Marie Ilarraza's Allegations</u>**

215.    Plaintiff Ilarraza is a citizen of St. Croix and rented a home located at 305 Enfield Green.

216.    The foul and noxious odor from the Refinery forced Ilarraza to evacuate her home for two days and check in to the King Christian Hotel in Christiansted—the town on the eastern part of the island of St. Croix.

217.    Ilarraza suffered nausea and headaches because of the foul odor arising from the Refinery.

218.    Ilarraza was unable to engage in her usual routine of sitting and relaxing on her porch because of the poor air quality and the unknown effects it will have on her health long-term.

219.    Because of her proximity to the Refinery she lives in fear and distress of a catastrophic chemical leak or fires at the Refinery.

220.    In addition to her physical symptoms, Ilarraza suffers from stress and emotional distress from her experience and the worry of long-term health impacts resulting from the Toxic Incidents.

**<u>Plaintiff Ryan Alleyne's Allegations</u>**

221.    Plaintiff Alleyne is a citizen of St. Croix who resides at 6 Enfield Green.

222.    In late April 2021, Alleyne began to notice a powerful odor emanating from the Refinery, which remained in the air for weeks.

223.    The odor permeated throughout Alleyne's home—there was no escaping the scent and its effects.

224.    Alleyne suffered from a burning sensation in his throat, hoarseness, pain in the throat, and nausea that led to multiple instances of vomiting, all because of the foul odor the Refinery produced.

225.    Alleyne also noticed a substance on his residence and vehicle that appeared to be black oil. His home was covered in black spots and the entirety of his vehicle was covered with the black oil-like substance.

226.    Because of his proximity to the Refinery, Alleyne lives in fear and distress of a catastrophic chemical leak or fires at the Refinery.

227.    In addition to his physical symptoms, Alleyne suffers from stress and emotional distress from his experience and the worry of long-term health impacts resulting from the Toxic Incidents

### Plaintiff Agnes Augustus's Allegations

228.    Plaintiff Augustus is a citizen of St. Croix who resides at 165 Clifton Hill.

229.    Augustus first noticed an odor emanating from the Refinery on April 28, 2021, and continued to smell the unpleasant odor for weeks afterward.

230.    The Refinery-produced odor that Augustus noticed was present in her home. It was especially strong inside Augustus's bedroom.

231.    Augustus experienced headaches, eye pain and irritation, chest pain, an aching back, throat pain and irritation, difficulty breathing, nausea, and stomach pain.

232.    The odor coming from the Refinery was so strong, and its effects so unpleasant, that Augustus had to leave her home to seek reprieve from the odor and its effects. But when she eventually returned to her home, the odor was still present.

233.    Augustus's symptoms led her to seek medical attention. She visited the hospital on April 23, 2021 and was told to consume fluids to help the symptoms.

234.    Augustus's residence was also coated in what appeared to be black oil on the roof and on the cistern

### Plaintiff Cesarina Miranda's Allegations

235.    Plaintiff Miranda is a citizen of St. Croix who resides at 69 Estate Profit.

236.    Miranda first began to notice an odor from the Refinery toward the end of April 2021 and continued to smell the odor weeks later. The odor was noticeable even inside Miranda's home.

237.    As a result of the odor emanating from the Refinery, Miranda experienced eye irritation and pain, a runny nose, sneezing, throat irritation and pain, headaches, stomach pain, and diarrhea.

238.    In an attempt to escape the odor and the symptoms it caused her, Miranda began to leave her home during the day and return at night. She wanted to leave her home entirely but had nowhere else to stay for an extended period.

239.    Miranda sought medical attention for the symptoms she experienced and was prescribed medication in an attempt to alleviate them.

### vi.    EPA Intervention

240.    As a result of the Toxic Incidents, the EPA had no choice but to intervene in Defendants' operation of the Refinery.

241.    On March 25, 2021, amid concerns raised by and appeals filed by non-governmental organizations and members of the community, the EPA withdrew the PAL permit granted to the Refinery in December 2020, that had never gone into effect due to a number of

appeals. Though the permit was withdrawn, the Refinery's operations were permitted to continue pursuant to the dozen other Clean Air Act permits issued to HOVENSA and subsequently transferred to the Refinery.

242.    During a visit to the Refinery in April 2021 by the EPA, "Limetree representatives stated that Limetree has a single Environmental Department, known as the Health, Safety, and Environmental ("HSE") Department, serving the entire Facility, including the Refinery and marine loading terminal operations. In addition to managing environmental compliance at the Facility, the HSE department also oversees safety and implementation of COVID-19-related procedures. The entire HSE department consists of 5 employees. Limetree representatives noted they did have consultant support."[70]

243.    The EPA, in response to this revelation concerning the severely limited staffing that Defendants supplied at the Refinery in order to cut corners and save on costs, stated, in pertinent part: "[a] Refinery of this size and complexity would be expected to have 10-20 full time onsite staff in its health, safety and environment department."[71]

244.    As such, Defendants were severely understaffed with respect to health, safety, and environmental concerns, and were not adequately staffed to run a Refinery of this size—especially given the Refinery's calamitous history, dangerous and unrepaired infrastructure from past operations, and proclivity to cause environmental disasters affecting St. Croix.

245.    On April 30, 2021, the EPA issued a Notice of Violation to the Limetree Defendants for their failure to operate five sulfur dioxide ("SO2") ambient air monitors as required by one of the Clean Air Act permits issued to the Refinery.

---

[70] May 14 Order at ¶ 91.
[71] *Id.* at ¶ 92.

246.    Consequently, the EPA invoked its emergency powers to shut the Refinery down. On May 14, 2021, the EPA ordered Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC to pause all operations at the Refinery "due to multiple improperly conducted operations that present an imminent risk to public health."[72] The EPA took this urgent measure under its legal authority set forth in Clean Air Act Section 303, to address "when an entity's actions are substantially endangering public health, welfare, or the environment." *Id*.

247.    Notably, in announcing the May 14 2021 Order, the EPA emphasized that the Refinery "is located in a community that is disproportionately affected by environmental burdens and its repeated incidents raise significant environmental justice concerns, which are a priority for EPA." *Id*. Further justifying its actions, the EPA noted that "[t]his already overburdened community has suffered through at least four recent incidents that have occurred at the facility, and each had an immediate and significant health impact on people and their property." *Id*.

248.    The EPA's May 14, 2021 Order was to remain in effect for sixty (60) days unless extended through the filing of a civil action in court. Regardless, when Refinery operations were to resume, the EPA emphasized that the Refinery must be operated "in a manner that does not present an imminent and substantial endangerment to the public and protects the health and welfare of residents living near the facility." *Id*.

249.    On July 12, 2021, the U.S. Department of Justice, on behalf of the EPA, filed a complaint in this Court against Limetree Bay Terminals LLC and Limetree Bay Refining LLC alleging that the Refinery presents an imminent and substantial danger to public health and the

---

[72] Press Release, EPA, "EPA Uses Emergency Powers to Protect St. Croix Communities and Orders Limetree Bay Refinery to Pause Operations" (May 14, 2021), available at https://www.epa.gov/newsreleases/epa-uses-emergency-powers-protect-st-croix-communities-and-orders-limetree-bay-refinery (last accessed January 17, 2023).

environment. No. 21-cv-00264, Dkt. No. 1 (the "DOJ Action").[73]  With the filing of the complaint, the EPA's May 14, 2021 Order was automatically extended by fourteen (14) days. The DOJ Action sought, among other things, an injunction requiring the Limetree entities to comply with the requirements of the EPA's May 14 Order and "to take all measures necessary to eliminate the imminent and substantial endangerment before restarting refinery operations…."[74]

250.    On the same date that the DOJ Action was filed, the parties in that matter filed a stipulation pursuant to which the Limetree entities acknowledged that the Refinery was not currently operating, that they did not intend to restart the Refinery at the present time, and, further, that they agreed to do the following:

a.    Complete all corrective measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment posed by the Refinery or Refinery process units before the Refinery or any Refinery process units restart;

b.    Notify the United States and the court no fewer than 90 days before restarting the Refinery or any Refinery process unit;

c.    Install hydrogen sulfide and sulfur dioxide monitors at nine monitoring sites prior to any restart of the Refinery or any Refinery process unit; and

d.    Submit a plan for EPA approval to purge hydrocarbons from Refinery process units and other equipment at the Refinery as part of the process of indefinite shutdown, with such plan including the operation of ambient air monitoring. [75]

---

[73]Press Release, DOJ, "United States Files Complaint and Reaches Agreement on Stipulation with Limetree Bay Terminals and Limetree Bay Refining LLC Relating to Petroleum Refinery in St. Croix, U.S. Virgin Islands" (Jul. 12, 2021), available at https://www.justice.gov/opa/pr/united-states-files-complaint-and-reaches-agreement-stipulation-limetree-bay-terminals-llc          (last accessed January 17, 2023).
[74]*Id.*
[75]*Id.*

251.    Despite the involvement of the EPA and DOJ, however, the damage to the surrounding neighborhoods, communities, people, real property, personal property, and the island of St. Croix, had already been done.

### vi.    OSHA Identifies Numerous "Serious" Violations at the Refinery in Wake of the Toxic Incidents

252.    Adding to the scrutiny and resulting regulatory action of the EPA in the aftermath of the Toxic Incidents, on November 8, 2021, the U.S. Occupational Safety and Health Administration ("OSHA") issued a Citation and Notification of Penalty to Limetree that included nineteen (19) "serious" violations with respect to the Refinery. Several of these violations addressed the dire impact of Defendants' failure to properly refit the Refinery before reopening, including the following:

    a.    ***That the facility's knockout drums did not comply with recognized and general accepted good engineering practices***: The Complex Flare Knockout Drum and Coker Flare Knockout Drum did not have sufficient capacity to handle liquids during an emergency release from the Coker Unit. The failure to provide sufficient capacity for knockout drums caused drums to overflow with an oily mist, resulting in liquid carryover to flare, flare rainout, fire, and exposing employees and the surrounding communities to flammable, toxic, and respiratory hazards.

    b.    ***Limetree's thermal radiation equipment did not comply with recognized and general accepted good engineering practices***: The failure to protect employees and equipment from thermal radiation levels during flaring events can result in severe burn injuries, exposure to toxic and respiratory hazards, and cause equipment to catastrophically fail.

    c.    ***Limetree's 2020 UNIT 8500 Coker Unit Re-do Process Hazard Analysis Final Report did not evaluate and control hazards of the Delay Coker Unit***: The failure to evaluate and control hazards for abnormal coke drum caused overfill/overpressure of the Coker Drum, liquid carryover to flare, and exposed employees, contractors, and off-site communities to fire explosion and toxic release hazards.

253.    Coming as it did six months after the last of the Toxic Incidents, the OSHA report made clear what affected residents know all too well, namely, that Defendants' reckless conduct in cutting corners and in rushing to reopen the Refinery without properly and safely refitting the

facility, and without the proper supervision and oversight in place at all levels, had catastrophic consequences for the surrounding communities, including Plaintiffs and the Class.

       **vii.**    **Limetree Bay Refining Declares Bankruptcy While Plaintiffs and the Class Are Left Without Water and Working Cisterns**

254.    On July 12, 2021, Limetree Bay Refining filed a Chapter 11 Petition for Bankruptcy with the U.S. Bankruptcy Court for the Southern District of Texas. Case No. 4:21-BK-32351, ECF No. 1.

255.    On August 10, 2021, Plaintiffs in this matter and the related class actions, the Official Committee of Unsecured Creditors in the bankruptcy proceeding (the "Creditors' Committee"), and the Debtor, Limetree Bay Refining, entered into a stipulation whereby the parties agreed to voluntarily stay the pending class actions with respect to non-Debtor defendants in those matters and to mediate "exigent and essential health and safety issues related to the plaintiffs in the class actions … [and] to work consensually to address the exigent needs of the residents of the U.S. Virgin Islands for access to clean water for drinking, bathing, cooking, and gardening, and the health and safety of pets and livestock."[76]

256.    Thereafter, the undersigned counsel for Plaintiffs, counsel for plaintiffs in the related class actions, the Debtor, non-Debtor defendants, insurance carriers for the Debtor and non-Debtor defendants, and the Creditors' Committee engaged in a mediation process to attempt to address these critical issues.

257.    The mediation began on August 26, 2021, and continued over multiple sessions before the Bankruptcy Court-appointed mediator, the Hon. Marvin Isgur, U.S. Bankruptcy Judge. During the mediation process, Plaintiffs and their counsel sought to address the urgent needs of

---

[76] *See* Case No. 21-AP-03791, ECF No. 56.

Plaintiffs and the Class for access to clean water and to create a program to provide water to affected residents following the Toxic Incidents.

258.    Ultimately, the parties to the mediation reached agreement on a water stipulation that was then entered by the U.S. Bankruptcy Court for the Southern District of Texas on October 29, 2021.[77] Pursuant to the Water Stipulation, the Limetree Defendants' existing water program was expanded to include additional communities, providing that the water program would be available to "all people who reside in the communities comprising the subdistricts of Southcentral, Northcentral, Southwest and Frederiksted." Ex. 1 at 3. The Water Stipulation provided for extended hours of operation at the Limetree Distribution Center and further established two additional water distribution centers. *Id*.

259.    Despite the agreed-upon Water Stipulation and its initial implementation, the Limetree Defendants quickly made it clear that they did not intend to comply with the terms of the Water Stipulation. For example, shortly after the program was implemented, the Limetree Defendants reduced the amount of water available for distribution as well as the hours of distribution at the established water distribution centers.[78] Further, area residents were made to wait in unreasonably long lines at the water distribution points only to be told, in many instances, that the water supply at that location had been exhausted, before being directed to return at another time and/or location. In addition, even when the sites were open and water was available, impacted residents were subjected to abrasive, adversarial interviews by Defendants' employees or contractors regarding their eligibility to receive water under the program, including incidents

---

[77] *See* Stipulation and Agreed Order Adopting Water Distribution Program, *Limetree Bay Refining, LLC v. Cotton*, No. 21-03791, R. Doc. 126 (Bankr. S.D. Tex. Oct. 29, 2021) ("Water Stipulation"). A copy of the Water Stipulation is attached hereto as Exhibit 1.

[78] *See, e.g.*, Everbridge NIXLE, *Limetree Bay Energy Water Distribution Sites Hours Updated* (Jun. 21, 2022), available at http://nixle.us/DPMLD (last accessed January 17, 2023).

where Defendants demanded to see a resident's driver's license before allowing them to receive water. Class members were made to feel as if they had done something wrong simply for trying to obtain safe and clean water that had been denied to them due to Defendants' conduct in the first place. Defendants compounded these issues by arbitrarily denying water to certain citizens even when their neighbors in the same neighborhood were provided water under the program.

260.     Additionally, certain of the Limetree Defendants' employees or contractors who were charged with implementing the water distribution plan expressed discomfort and unsubstantiated concerns for their safety working in the primarily poor black and brown communities where the plan was implemented. This only further handicapped efforts to provide clean and safe water to the very people most impacted by Defendants' conduct.

261.     Ultimately Defendants ended the water program altogether, without a court order or approval, on September 30, 2022, despite ongoing contamination issues as a result of the Toxic Incidents.

### viii.    Recent Developments Concerning the Refinery

262.     Following the EPA intervention and subsequent bankruptcy of Limetree Bay Refining, West Indies Petroleum and Port Hamilton Refining and Transportation bought the Refinery in December 2021 for $62 million as a result of a bankruptcy auction process.[79] The new owners indicated that they planned to restart the facility. *Id*.

---

[79] Laura Sanicola, *Bankruptcy judge approves $62 million Limetree Bay sale to Jamaican company*, Reuters, Dec. 22, 2021, available at https://www.reuters.com/business/energy/bankruptcy-judge-approve-62-million-limetree-bay-sale-jamaican-company-2021-12-21/ (last accessed January 17, 2023).

263.     In October 2022, the EPA reported multiple safety issues at the Refinery that had been uncovered during earlier inspections of the facility.[80] Specifically, in September 2022, less than a year after ownership passed, the EPA conducted an inspection of the Refinery under the new ownership and observed "significant corrosion" of equipment, including corrosion of vessels, piping and valves.[81] The inspection followed a fire that broke out at the Refinery in August 2022 in a pile of coke in the facility's North Coke Dome. *Id*. Though Port Hamilton claimed the fire was quickly controlled, the EPA said it burned for approximately two weeks and was eventually extinguished with the help of 11 mainland contractors and 43 local contractors. *Id*.

264.     Upon inspection of the facility, the EPA found that maintenance and internal inspection issues at the plant could result in the release of toxic materials and that valves and piping in containers of anhydrous ammonia — which can cause severe respiratory injuries — "are in an advanced state of corrosion and disrepair." [82] Such conditions, the EPA found, "demonstrate a risk of catastrophic release of anhydrous ammonia and off-facility impact." *Id*.  Further, the EPA noted that exposed wires at the Refinery created a fire risk. *Id*.

265.     Plaintiffs and the Class were left wondering why federal officials did not do more to protect "the health of this Caribbean island's largely Black and Brown population."[83] Deanna James, president of the St. Croix Foundation, described the EPA's findings as equally alarming

---

[80] Mat Probasco, *EPA Finds Refinery Faults*, The St. Thomas Source, Oct. 25, 2022, available at https://stthomassource.com/content/2022/10/25/epa-finds-refinery-faults/ (last accessed January 17, 2023).

[81] Maxine Joselow, *EPA closed a refinery that rained oil. Now it's a 'ticking time bomb'*, The Washington Post, Oct. 28, 2022, available at https://www.washingtonpost.com/climate-environment/2022/10/28/refinery-st-croix-epa-limetree/ (last accessed January 17, 2023).

[82] Probasco, *supra* note 80.

[83] Joselow, *supra* note 81.

and affirming to those who have viewed the Refinery as a "ticking time bomb" and had been warning about the dangers posed by the facility since 2019. *Id*.

266.   The deplorable state of the Refinery as recently documented by the EPA validates the view of environmental advocates that the Refinery has been in this condition for some time and was in a similarly deplorable state during its previous brief operation between February and May 2021 when the Toxic Incidents occurred. This further demonstrates that the restart and operation of the Refinery during this period was not performed in a safe or cautious manner.

267.   In November 2022, the EPA announced that it will require the Refinery to obtain a new Clean Air Act permit before resuming operations.[84] The permit would require detailed air-quality analyses and the use of the best available air pollution control technology. *Id*. In addition, the EPA ordered the Refinery's owners to remove thousands of pounds of dangerous chemicals from the site, including 40,000 pounds of anhydrous ammonia, 37,000 pounds of liquefied petroleum, as well as hydrogen sulfide.[85]

### ix.   The Disproportionate Effects of Defendants' Conduct on Minority Communities

268.   As set forth above, Plaintiffs and the Class have suffered severe economic and non-economic harms because of Defendants' conduct.

269.   Furthermore, as the EPA has recognized repeatedly, "Limetree Bay is in a community predominantly made up of people of color and low-income populations who are

---

[84]Laura Sanicola, *St. Croix refinery cannot restart without new permit, air pollution tech -EPA*, Reuters, Nov. 17, 2022, available at https://www.reuters.com/business/environment/st-croix-refinery-cannot-restart-without-new-permit-air-pollution-tech-epa-2022-11-17/ (last accessed January 17, 2023).

[85] *US orders chemicals removed at Virgin Islands oil refinery*, The Associated Press, Dec. 5, 2022, available at https://abcnews.go.com/International/wireStory/us-orders-chemicals-removed-virgin-islands-oil-refinery-94505018 (last accessed January 17, 2023).

already disproportionately affected by environmental burdens," and "[t]hese disproportionate burdens present environmental justice concerns."[86]

270.    Indeed, the EPA found that in the neighborhoods adjoining the Refinery, 27% of residents live below the poverty line and 75% are people of color. Though every neighborhood downwind of the Refinery reported significant impacts to health and environment, the impacts were severe in the predominantly low-income black and brown neighborhoods that line the northwest side of the Refinery.[87]

271.    The EPA concluded that "in light of the burden already experienced by the nearby low income and minority populations, [the EPA] is requiring Limetree to resume an ambient air monitoring network that will measure $NO_2$, $SO_2$ and $PM_{2.5}$."[88]

272.    Defendants, however, balked at those requirements and refused to implement the necessary monitoring to protect these minority populations, as evidenced by the EPA's April 30 notice of violation to the Refinery for failing to install the monitors.[89]

273.    This is not the first time that Defendant Arclight has targeted and exploited vulnerable communities of color. According to data analyzed by the University of Massachusetts, Arclight has incurred millions of dollars in penalties for environmental violations, with minorities accounting for more than 35% of the impact of those violations.[90]

---

[86]News Release, EPA, "EPA Notifies Limetree Bay of Clean Air Act Violations" (May 3, 2021), available at https://www.epa.gov/newsreleases/epa-notifies-limetree-bay-clean-air-act-violations (last accessed January 17, 2023).
[87]Bennington College, *supra* note 67.
[88]EPA, *Region 2 Office Final Environmental Justice Analysis for Limetree Bay Terminal and Refining (Limetree) PAL Permit St. Croix, U.S. Virgin Islands* (Sept. 19, 2019), at p. 14.
[89]News Release, EPA, "EPA Notifies Limetree of Clean Air Act Violations" (May 3, 2021), available at https://www.epa.gov/newsreleases/epa-notifies-limetree-bay-clean-air-act-violations (last accessed January 18, 2023).
[90]University of Massachusetts Amherst Political Economy Research Institute, *ArcLight Capital Partners Profile*, available at

274.    This data shows that Arclight preys on communities of color, where environmental laws are underenforced, by refusing to implement the necessary protective and remedial measures to prevent harmful, toxic incidents like those endured by Plaintiffs and the Class, on the assumption that these vulnerable communities lack the resources to seek recourse for the harm caused by Arclight's exploitation.

## V.    CLASS ACTION ALLEGATIONS

275.    Plaintiffs bring their claims individually and pursuant to Federal Rule of Civil Procedure 23(a), as well as Rule 23(b)(2), (b)(3), and/or (c)(4), as representatives of a Class defined as follows:

> All persons or entities who reside or were located within the subdistricts of Southcentral, Northcentral, Southwest, and Frederiksted (including, without limitation, the communities of Clifton Hill, Profit Hills, Kingshill, University of Virgin Islands Campus, Hannah's Rest, Frederiksted, Estate Northside, Smithfield, Upper Bethlehem, Mars Hill, Estate Carlton, Golden Grove, Grove Place, Negro Bay, Williams Delight, Whim, Sandy Point, La Grange, and Prosperity) (the "Affected Geographic Area"), or owned or leased property within the Affected Geographic Area, during any of the Toxic Incidents (the "Class").

276.    Excluded from the Settlement Class are: (i) Defendants, their officers, directors, affiliates, legal representatives, successors, and assigns, and entities in which Defendants have any financial interest; (ii) judges presiding over the Litigation; and (iii) local, municipal, state, and federal governmental entities.

277.    In addition, Plaintiffs allege a separate medical monitoring class defined as follows:

> All persons who reside or were located within the Affected Geographic Area during any of the Toxic Incidents (the "Medical Monitoring Class").

---

https://grconnect.com/tox100/ry2018/index.php?search=yes&company1=535&chemfac=chemfac&advbasic=adv&sortp=city (last accessed January 18, 2023).

278.   The Class and Medical Monitoring Class are referred to collectively herein as the "Classes."

279.   Plaintiffs reserve the right to redefine the Classes at any time up to and including their Motion for Class Certification based upon discovery in this lawsuit, divide the Classes into separate classes, or propose separate subclasses to the Court for certification, based upon discovery in the lawsuit.

280.   **Numerosity.** Members of the Classes are so numerous that joinder is impracticable. The Classes each number in the thousands, and as such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy.

281.   **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct of Defendants as alleged herein.

282.   **Adequacy of Representation.** Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Classes. Accordingly, by proving their own claims, Plaintiffs will prove other Class members' claims as well. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class actions, including, without limitation, environmental class actions involving toxic contamination. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Classes and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Classes.

283.    **Commonality and Predominance.** There are common questions of law and fact in this action that predominate over any individual issue relating to the common facts alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

- Whether Defendants' conduct alleged herein violates the laws as stated in the Causes of Action section set forth below;

- Whether Defendants owed duties to the Class members;

- Whether Defendants breached any duties owed to the Class members;

- Whether Defendants were negligent in failing to properly operate and maintain the Refinery, including without limitation, since its reopening;

- Whether Defendants were negligent in their hiring and supervision;

- Whether Defendants were reckless in failing to properly operate and maintain the Refinery, including without limitation, since its reopening;

- Whether Defendants were reckless in their hiring and supervision;

- Whether Defendants allowed a "release" or "threatened release" of a hazardous substance from the Refinery within the meaning of 42 U.S.C. § 9607(a)(4);

- Whether the Refinery constituted a public nuisance;

- Whether the Refinery constituted a private nuisance;

- Whether the contamination that resulted from the Toxic Incidents constituted a trespass to the Classes;

- Whether Class members are entitled to medical monitoring and early detection of disease;

- The appropriate nature of class-wide equitable relief; and

- The appropriate measurement of restitution and/or measure of damages or relief to each of the Classes

284.   The questions of law and fact common to the Classes members predominate over any questions that may affect only individual Class members, because Defendants acted on grounds generally applicable to the entire Classes.

285.   **Superiority**. Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

286.   Class treatment also is appropriate under Rule 23(b)(2) because Defendants acted and refused to act on grounds that apply generally to the Classes as a whole such that final injunctive relief and/or declaratory relief is warranted with respect to the Classes as a whole.

## VI.   CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (Against All Defendants)

287.   Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

288.   The actions of all Defendants were negligent as alleged herein.

289.   The primary financial backers and controllers of the Limetree Defendants, including, without limitation, Defendants Arclight and Freepoint were "hands-on" in the

acquisition, rehabilitation, permitting, and operation of the undercapitalized Refinery. Through Defendant Arclight and Freepoint and their subsidiaries, including Defendants Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals, Defendants bought the Limetree Bay Facility out of the HOVENSA bankruptcy, conducted work on the Limetree Bay Facility, made repairs and retrofits to the Refinery, sought permitting and waiver of the significant HOVENSA fine levied by the EPA as a means to protect the St. Croix community, and operated the Refinery.

290.    Defendants failed to properly store, use, refine, and/or dispose of oil and other Toxins.

291.    Defendants failed to ensure that the Refinery was safe to reopen when they knew or should have known it was not.

292.    Defendants failed to hire and/or train personnel to conduct the reopening in a safe and effective manner.

293.    Defendants continued Refinery operations after the first, second, third, *and fourth* Toxic Incidents. After each event, Defendants had the opportunity to comprehensively evaluate the safety of continued Refinery operations. Despite the events detailed above and clear warnings that the facility was not safe, and should not be operated, Defendants refused to close or limit operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately and voluntarily shut down after just *one* of these Toxic Incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* Toxic Incidents.

294.    Defendants' conduct fell below the standard of care of a reasonable property owner and/or operator in similar circumstances.

295.    Defendants knew and/or should have known that their failure to properly store, use, refine, and/or dispose of oil and other chemicals, toxins, and particulates at the Limetree Bay Refinery would allow these dangerous materials to contaminate surrounding neighborhoods and communities, and cause the residents to suffer personal injuries and property damages, including but not limited to diminution in value of their real and personal property.

296.    Defendants failed to warn and/or provide Plaintiffs, the Class, and the public with adequate and timely notice of the hazards and their potential impacts.

297.    Defendants' negligence caused both physical personal injuries and real and personal property damage to Plaintiffs and the Class.

298.    Defendants' negligence caused emotional distress, suffering, and anxiety to Plaintiffs and the Class.

299.    Defendants' negligence caused Plaintiffs and the Class to not have access to safe water.

300.    As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## <u>COUNT II</u>
### GROSS NEGLIGENCE
**(Against Defendants LBR Liquidating Trust; David M. Dunn; and Limetree Bay Terminals, LLC, as Owners of Operating Permits for the Limetree Bay Facility)**

301.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

302.    In the Virgin Islands, a claim for gross negligence requires a showing that: (a) the defendant owed plaintiff a legal duty of care; (b) the defendant breached that duty in such a way to demonstrate a wanton, reckless indifference to the risk of injury to plaintiff; (c) and the defendant's breach constituted the proximate cause of (d) damages to plaintiff.

303.    Defendants owed a legal duty of care to Plaintiffs and the Classes. *See generally* Counts I, III, IV & IX.

304.    Defendants' breaches demonstrate a wanton, reckless indifference to the risk of injury to the named-Plaintiffs and Classes.

305.    As a result, Plaintiffs and the Classes have been damaged as alleged herein.

<u>**COUNT III**</u>
**NEGLIGENCE PER SE**
**(Against Defendants LBR Liquidating Trust; David M. Dunn; Limetree Bay Terminals, LLC, as Owners of Operating Permits for the Limetree Bay Facility; and Contractor Defendants)**

306.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

307.    The actions of Defendants as set forth herein constitute negligence per se.

308.    Courts in the Virgin Islands have recognized negligence per se as a cause of action. *See Antilles School, Inc. v. Lembach*, 64 V.I. 400, 423 (V.I. 2016) (citations omitted). "A plaintiff suing for negligence per se relies on the doctrine that obviates the normal showings of the duty and breach-of-duty elements of an ordinary negligence claim by relying on the defendant's violation of a statute or other legally-binding regulation; that is, the plaintiff must demonstrate that the defendant had a duty to follow the law, failed to follow the law, and that such failure caused damages to the plaintiff as a person within the class intended to be protected by the statute or regulation." *Id.*

309.    Defendants had a duty to comply with numerous statutes and regulations, and failed to do so. Specifically, Defendants failed to comply with 28 V.I.C. § 331 (Private Nuisance) (*see infra* Count VIII), 42 U.S.C. § 7401, *et seq.* (Clean Air Act), 42 U.S.C. § 9601, *et seq.* (CERCLA), 12 V.I.C. § 201, *et seq.* (Virgin Islands Air Pollution Control Act) (*see infra* Count XI), 12 V.I.C.

§ 701, *et seq*. (Oil Spill Prevention and Pollution Control Act), and 12 V.I.C. § 181, *et seq*. (Virgin Islands Water Pollution Control Act).

310. One of the purposes of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare…." 42 U.S.C. § 7401(b)(1).

311. Defendants breached the standard of conduct required by the Clean Air Act when the H2S input gas concentration limit specified in 40 C.F.R. § 60.103a(h) and the Refinery's Title V Operating Permit of 162 parts per million volume determined hourly on a 3-hour rolling average basis were violated by multiple orders of magnitude.

312. Defendants also breached the standard of conduct required by the federal Clean Air Act's National Emissions Standards of Hazardous Air Pollutants ("NESHAPs"). Specifically, 40 C.F.R. § 63.670 regulates flare control devices. These requirements create various operation limits for individual flares, including but not limited to: (a) smokeless design capacity (40 C.F.R. § 63.670(c); (b) maximum flare tip velocity (*id.* at § 63.670(d)); and (c) combustion zone operating limits (*id.* at 63.670(e)). Flare #8 was subject to these requirements and due to the nature of the Toxic Incidents and how they were caused by Flare #8, it is highly likely that these operating limits were exceeded.

313. CERCLA was enacted to ensure that '"those responsible for problems caused by the disposal of chemical poisons [must] bear the costs and responsibility for remedying the harmful conditions they created.'" *U.S. v. E.I. Duport De Nemours and Co. Inc.*, 423 F.3d 161, 164 (3d Cir. 2005) (quoting *In re Tutu Water Wells CERCLA Litig.,* 326 F.3d 201, 206 (3d Cir. 2003) (citation omitted)).

314.    Defendants are liable for and breached the standard of conduct required by CERCLA § 107, 42 U.S.C. § 9607, when they released hazardous substances, including H2S (a listed hazardous substance pursuant to 40 C.F.R. § 302.4, Table), polynuclear aromatic hydrocarbons (same), polycyclic organic matter (same), including naphthalene (same), and waste oils into the environment.

315.    Defendants breached the standard of conduct required by the Air Pollution Control Act when they emitted air pollutants in violation of 12 V.I.C. §§ 208 and 217, which prohibit emissions of air contaminants and noxious and objectionable odors.

316.    Defendants breached the standard of conduct required by the Oil Spill Prevention and Pollution Control Act when they discharged oil, petroleum, or their byproducts, and other pollutants into or upon coastal waters, estuaries, tidal flats, beaches, and land adjoining the seacoast of the Territory in violation of 12 V.I.C. § 704.

317.    Defendants breached the standard of conduct required by Air Pollution Control Act, 12 V.I.C. § 201, *et seq*.

318.    The Air Pollution Control Act's "declaration of purpose" indicates that it seeks "to promote health, safety and welfare" and "to prevent injury to human, plant and animal life, and property."

319.    The purpose of the Air Pollution Control Act is to protect residents of the Virgin Islands from emissions of pollutants, and Plaintiffs and the Class are among the class of persons the Air Pollution Control Act was meant to protect.

320.    Defendants' discharge of oil and other chemicals, toxins, and particulates, into Plaintiffs' and Class members' residences and properties violated the Air Pollution Control Act.

321.    Defendants' actions constitute a violation of the Water Pollution Control Act, 12 V.I.C. § 180, *et seq*.

322.    The Water Pollution Control Act's "declaration of policy" indicates that it seeks "to promote health, and welfare" and "to protect, maintain and improve the quality thereof for public water supplies ... for domestic, recreational and other beneficial uses."

323.    The purpose of the Water Pollution Control Act is to protect residents of the Virgin Islands from the discharge of pollutants into and pollution of "any waters of the United States Virgin Islands."

324.    "'Waters of the United States Virgin Islands' means all waters within the jurisdiction of the United States Virgin Islands including … all other bodies or *accumulations of water*…. Natural or *artificial*, public or *private*…." Class members' cisterns and wells constitute Waters of the United States Virgin Islands, 12 V.I.C. § 182(f).

325.    Plaintiffs' and the Class are among the class of persons the Water Pollution Control Act was meant to protect.

326.    Unless a person has a current permit to discharge, "the discharge of any pollutant into the waters of the United States Virgin Islands or the causing of pollution of the waters of the Virgin Islands, by any person, shall be unlawful." 12 V.I.C. § 185(a).

327.    The chemicals emitted from the Refinery during the four Toxic Incidents constitute "pollutants" as defined by 12 V.I.C. § 182(b).

328.    The emissions of contaminants from the Refinery during the four Toxic Incidents caused "pollution," which is defined to include "contamination, or other alteration of the physical [or] chemical . . . properties, of any waters of the United States Virgin Islands, including change in … taste, color, … or odor of the waters, or such discharge of any liquid, gaseous, solid…. or

other substance into any waters as will or is likely to create a nuisance or render such waters harmful, detrimental, or injurious to public health, safety or welfare….” 12 V.I.C. § 182(a).

329.    Defendants’ unpermitted discharge of oil and other chemicals, toxins, and particulates, into the waters of the United States Virgin Islands, including the August 2020 overflow resulting from the failure of the Refinery’s stormwater pump, as well as pollution of Plaintiffs’ and Class members’ cisterns and wells, violated the Water Pollution Control Act.

330.    Each Toxic Incident described herein constituted a “discharge” as defined at 12 V.I.C. § 182(i), from a “point source,” as defined at 12 V.I.C. § 182(j), as a flare stack is a “discernable, confined and discrete conveyance” and “conduit” “from which pollutants” were discharged.

331.    The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class.

332.    As a direct and proximate result of Defendants’ conduct as set forth herein, Plaintiffs and Class Members have suffered damages in an amount to be proven at trial and are entitled to injunctive relief pursuant to 12 V.I.C. § 190(a).

<u>**COUNT IV**</u>
**ABNORMALLY DANGEROUS CONDITION**
**(Against All Defendants)**

333.     Plaintiffs’ allegations are incorporated by reference as though fully set forth herein.

334.    Defendants’ actions as set forth herein constitute maintaining an abnormally dangerous condition.

335.    The Refinery is located just south of residential communities, including the communities in which Plaintiffs reside or work. Further, the natural resources of the U.S. Virgin Islands are particularly sensitive and precious.

336.     Defendants Arclight and Freepoint were "hands-on" in the acquisition, rehabilitation, permitting, and operation of the Limetree Bay Facility. Through Arclight's and Freepoint's subsidiaries, including Defendants Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining, and Limetree Bay Terminals, Defendants bought the Limetree Bay Facility out of the HOVENSA bankruptcy, conducted work on the Refinery, made repairs and retrofits to the Refinery, sought permitting and waiver of the significant HOVENSA fine levied by the EPA as a means to protect the St. Croix community, and operated the Refinery.

337.     Defendants' use, storage, refining, and/or disposal of oil and other chemicals, toxins, and particulates was solely for Defendants' business purposes.

338.     Defendants knew and understood that there was a high risk that the oil and other chemicals, toxins, and particulates could contaminate nearby neighborhoods and surrounding communities, including the risk of contaminating cisterns – the only other source of clean water for residents – and cause residents to suffer personal injuries and property damage, including but not limited to the diminution of value of their real and personal property.

339.     Defendants' use, storage, refining, and/or disposal of oil and other chemicals, toxins, and particulates at the Refinery did in fact cause serious harm to Plaintiffs' and Class members' persons, chattel, and property, including both real and personal property.

340.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and Class Members have suffered damages in an amount to be proven at trial.

## COUNT V
### RESPONSE COSTS UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT
**(Against Defendants LBR Liquidating Trust; David M. Dunn; and Limetree Bay Terminals, LLC)**

341.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

342.    The Refinery is a "facility" within the meaning of 42 U.S.C. § 9601(9).

343.    Each Defendant is (a) a current owner or operator of the Refinery; (b) a former owner or operator of the Refinery at the time the hazardous substances described herein were released; (c) a generator or other party who arranged for disposal of hazardous substances at the Refinery; and/or (d) a transporter of hazardous substances to the Refinery pursuant to 42 U.S.C. § 9607(a).

344.    Defendants "released" or "threatened release[s]" into the environment of hazardous substances, as defined by 42 U.S.C. § 9601(14), from the Limetree Bay Facility within the meaning of 42 U.S.C. § 9607(a), including but not limited to H2S, polycyclic organic matter (a listed hazardous air pollutant pursuant to 42 U.S.C. § 7412), including naphthalene (same), waste, oils, and other hazardous substances.

345.    To the extent regulated, such releases were in violation of Defendants' Title V Permit and other requirements of the Clean Air Act, and therefore unpermitted.

346.    As a result of the release of hazardous substances from the Refinery, Plaintiffs and the Class have incurred response costs consistent with the national contingency plan. Response costs include testing and cleaning costs, and the cost to purchase bottled water.

347.    Plaintiffs and the Class have suffered harm as a result of these releases and are entitled to declaratory judgment, injunctive relief, and response costs incurred as a result thereof.

## COUNT VI
### PUBLIC NUISANCE

**(Against All Defendants)**

348.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

349.     The actions of Defendants constitute a public nuisance as defined under 14 V.I.C. § 1461.

350.    Specifically, Plaintiffs' and Class Members' homes, bodies, and emotional well-being have been damaged by Defendants' release of oil and other injurious chemicals, toxins, and particulates into their neighborhoods and communities. The public at large, however, has not endured such damages.

351.    Plaintiffs and the Class are entitled to damages as a result thereof.

352.    Plaintiffs and the Class are further entitled to an injunction requiring Defendants to cease and desist all activities that resulted in the release of pollutants, and further to an injunction requiring Defendants to remove and remediate all pollutants that have been allowed to escape Defendants' premises.

## COUNT VII
## PRIVATE NUISANCE/TRESPASS
**(Against All Defendants)**

353.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

354.    Defendants' actions constitute a private nuisance and/or a trespass.

355.    Defendants' discharge of oil and other chemicals, toxins, and particulates, into Plaintiffs' and Class members' residences and other properties, interfered with Plaintiffs' and Class members' use and enjoyment of their homes and properties, damaged their homes and properties, and caused personal injuries.

356.    By so doing, Defendants have wrongfully and unreasonably interfered with Plaintiffs' and Class members' private use and enjoyment of their homes and properties.

357.    As a result, Plaintiffs and the Class have been damaged as alleged herein in an amount to be proven at trial.

**COUNT VIII**
**STATUTORY PRIVATE NUISANCE**
**(Against All Defendants)**

358.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

359.    Defendants' actions constitute a private nuisance in violation of 28 V.I.C. § 331.

360.    Defendants' discharge of oil and other chemicals, toxins, and particulates into Plaintiffs' and Class members' residences and other properties, interfered with Plaintiffs' and Class members' use and enjoyment of their homes and properties, damaged their homes and properties, and caused personal injuries.

361.    By so doing, Defendants have wrongfully and unreasonably interfered with Plaintiffs' and Class members' private use and enjoyment of their homes and properties.

362.    As a result, Plaintiffs and the Class have been damaged as alleged herein in an amount to be proven at trial.

**COUNT IX**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(Against All Defendants)**

363.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

364.    The actions of Defendants negligently inflicted emotional distress on Plaintiffs and the Class.

365.    Defendants owed Plaintiffs and Class Members a duty of care to ensure that they did not suffer from serious emotional distress, which duty arose by operating an abnormally hazardous condition, through the common law, and through statutory and regulatory obligations to prevent hazardous material from escaping from the Refinery.

366.    Defendants breached their duty to Plaintiffs and the Class.

367.    As a direct and proximate result of Defendants' breach, Plaintiffs and the Class have suffered severe emotional injury.

368.    As a result, Plaintiffs and the Class have been damaged as alleged herein in an amount to be proven at trial.

**COUNT X**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against All Defendants)**

369.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

370.    The actions of Defendants constitute the intentional infliction of emotional distress on Plaintiffs and the Class.

371.    In the Virgin Islands, a claim of IIED requires a showing that a party: (a) intentionally or recklessly; (b) engaged in extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society; and (c) that it caused the plaintiff to suffer severe emotional distress.

372.    Defendants know and understand that exposure to discharge of oil and other chemicals, toxins, and particulates, and other particulates and hazardous substances presented, continues to present serious risks to the health and property of thousands of St. Croix residents.

373.    Defendants knew that before Defendants' ownership, control, and operation of the Limetree Bay Refinery, the property was owned and operated by HOVENSA, LLC, a joint venture between Hess Corporation and Petroleos de Venezuela, the national oil company of Venezuela, and before that by HOVIC, a wholly-owned subsidiary of the Hess Corporation formerly known as Amerada Hess.

374.    Defendants knew that under HOVIC and HOVENSA, the Refinery exceeded allowable emissions of known harmful substances, including nitrogen oxide, sulfur dioxide, volatile organic compounds, and benzene.

375.    Defendants knew that in 2011, investigators discovered that the pipes carrying the Refinery's waste product had been corroding, slowly leaking more than 43 million gallons of oil into the island's largest aquifer.

376.    Defendants knew that as a result of the massive leak, the EPA ordered HOVENSA to pay civil penalties of more than $5 million and spend more than $700 million in new pollution controls to protect the public health and resolve Clean Air Act violations in St. Croix. The EPA required HOVENSA to implement new and upgraded pollution controls, more stringent emission limits and aggressive monitoring, and leak detection and repair practices to reduce emissions from refinery equipment and process units.

377.    Defendants knew that instead of paying its fines and undertaking the required improvement projects, the Hess Corporation shut down the HOVENSA facility in 2012.

378.    Defendants knew of the history of prior emissions at the Refinery and their impact on the community.

379.    Defendants knew or should have known that the Refinery was not in a proper condition to re-open and that the start-up would result in discharges and dangers to Plaintiffs and Class Members.

380.    As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members suffered severe emotional injury.

**COUNT XI**
**VIOLATION OF VIRGIN ISLANDS AIR POLLUTION CONTROL ACT**
**(Against All Defendants)**

381.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

382.    Defendants' actions constitute a violation of 12 V.I.C. § 201, *et seq*.

383.    The Virgin Islands Air Pollution Control Act's "declaration of purpose" indicates that it seeks "to promote health, safety and welfare" and "to prevent injury to human, plant and animal life, and property."

384.    The purpose of the Air Pollution Control Act is to protect residents of the Virgin Islands from emissions of pollutants.

385.    Plaintiffs and the Classes are among the class of persons the APCA was meant to protect.

386.    Defendants' discharge of the Toxic Contaminants into Plaintiffs' and Class members' residences violated the Air Pollution Control Act.

387.    As a result, Plaintiffs and the Classes have been damaged as alleged herein.

## COUNT XII
## MEDICAL MONITORING
### (Against All Defendants)

388.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

389.    Plaintiffs and the Medical Monitoring Class members were significantly exposed to the Toxic Contaminants that are proven to be hazardous to health because of Defendants' repeated failures to prevent the discharge of the Toxic Contaminants since the February 2021 restart of the Refinery, including because of the Toxic Incidents referenced herein.

390.    The exposure to these dangerous substances is such that Plaintiffs and the Medical Monitoring Class members have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer, and as such, require medical monitoring which Defendants are responsible for providing and paying for.

391.    Monitoring and testing procedures for cancer and other illnesses associated with exposure to the Toxic Contaminants exist which make the early detection and treatment of the disease possible and beneficial.

392.    As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs and Medical Monitoring Class members for their economic damages.

**COUNT XIII**

**PIERCING OF THE CORPORATE VEIL AND ALTER EGO**
**(Against Defendants Limetree Bay Ventures, LLC; Limetree Bay Holdings, LLC; LBR Liquidating Trust; David M. Dunn; Limetree Bay Terminals, LLC; Arclight Capital Partners, LLC; Freepoint Commodities, LLC; and EIG Global Energy Partners, LLC)**

393.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

394.    Plaintiffs ask that the Court pierce the corporate veil and find that Limetree Bay Refining—now insolvent and represented by LBR Liquidating Trust as successor-in-interest and David M. Dunn, the liquidating trustee—and Defendant Limetree Bay Terminals, are jointly and severally liable with Defendants Limetree Bay Ventures, Limetree Bay Holdings, Arclight, Freepoint, and EIG.

395.    Limetree Bay Refining and Limetree Bay Terminals operated as mere alter egos of each other. For example, Limetree Bay Refining and Limetree Bay Terminals were parties to a Shared Services Systems Agreement ("SSS Agreement") pursuant to which both entities "share[d] services (*e.g.*, water, power, wastewater, etc.), facilities (*e.g.*, on-site office space, employee housing, parking lots, etc.), employees, and insurance coverage." Declaration of Mark Shapiro in Support of Chapter 11 Petitions and First Day Motions at p. 9, *In re Limetree Bay Refining*, No. 21-32351 (Bankr. S.D. Tex. July 12, 2021). This sharing of services, assets, and personnel resulted

in an excessive comingling that far exceeds any norms that characterize a sister-company relationship.

396.    In addition to agreeing to share costs and employees, Limetree Bay Refining and Limetree Bay Terminals also blurred all physical separation between the two entities by sharing property as well. The two entities, controlled in all respect by their primary financial backers as described above, reciprocally conveyed an undivided interest of all properties and facilities owned by each entity to the other entity, such that each entity "jointly own as tenants in common" all properties and facilities owned by both entities. *See* Objection and Reservation of Rights to Debtors' Emergency Motion for Entry of Interim and Final Orders at p. 5, *In re Limetree Bay Refining*, No. 21-32351.

397.    Upon information and belief, Limetree Bay Terminals also siphoned funds from Limetree Bay Refining by requiring Limetree Bay Refining to pay nearly $5.5 million in storage costs each month for storage at a shared and co-owned facility.

398.    Plaintiffs accordingly assert that the legal separateness of Limetree Bay Refining—now insolvent and represented by Defendant LBR Liquidating Trust as successor-in-interest and David M. Dunn, the liquidating trustee—and Defendant Limetree Bay Terminals ceased to exist and that honoring the corporate fiction would result in an injustice.

399.    Further, Limetree Bay Refining's and Limetree Bay Terminals' parent company, Limetree Bay Ventures, LLC ("Limetree Bay Ventures"), operated as a mere holding company for Limetree Bay Refining and Limetree Bay Terminals that served no separate existence or function outside of the corporate interests of Limetree Bay Refining and Limetree Bay Terminals. Limetree Bay Ventures was also the former holding company of Limetree Bay Holdings, LLC, which is the entity that bought the Limetree Bay Facility out of the HOVENSA bankruptcy.

400.    Limetree Bay Ventures failed to maintain corporate formalities and acted as a mere alter ego of its subsidiaries, as evidenced by, upon information and belief, Limetree Bay Venture's (i) maintenance of insurance coverage for the Refinery, (ii) lack of employees, and (iii) shared officers with Limetree Bay Refining and Limetree Bay Terminals.

401.    Upon information and belief, Arclight and Freepoint have a majority equity interest in Limetree Bay Ventures, which was the former parent company of Limetree Bay Holdings, and was the holding company of Limetree Bay Refining and Limetree Bay Terminals during the time period giving rise to this litigation.

402.    Upon information and belief, Arclight and/or Freepoint, through their investment and ownership in Limetree Bay Holdings, LLC, were the primary entities involved in the purchase of the Limetree Bay Facility and all negotiations with the EPA, including waiving fines from the HOVENSA environmental disaster and securing the issuance of permits to Limetree Bay Facility for operation.

403.    Arclight and Freepoint dominated and controlled the Limetree Bay Facility, including, without limitation, its management and operations, through a mere corporate façade. Upon information and belief, Arclight and Freepoint were the primary entities responsible for capitalizing, and profiting from, the refurbishment and recommissioning of the Limetree Bay Facility. The entities operating the Limetree Bay Facility—Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining, and Limetree Bay Terminals—were set up as entities merely existing to create layers of separation between Arclight and Freepoint because of the history of environmental disasters at the Refinery. This entity separation is merely a corporate façade and an abuse of the privilege of incorporation.

404.    Arclight and Freepoint woefully undercapitalized the refurbishment and recommissioning of Limetree Bay Facility, specifically the Refinery, for an undertaking of its magnitude. The entity's undercapitalization is evidenced by, among other things, the four significant environmental disasters that occurred in less than four months of operation (one occurring in the first four days of operation), the wholly inadequate staffing at the Refinery in the short time it operated, and the Refinery's current deplorable condition. Arclight and Freepoint intentionally incurred risk that the Refinery would cause more environmental damage to the neighboring communities, fully knowing that Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals were undercapitalized and could not support such an operation.

405.    Upon information and belief, Arclight and Freepoint were directly involved in the decision to continue Refinery operations after the first, second, third and fourth toxic events. After each environmental disaster, Arclight and Freepoint had the opportunity to comprehensively evaluate the safety of continued Refinery operations. Despite the clear warnings that the facility was not safe, and should not be operated, Arclight and Freepoint refused to close operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* toxic incidents.

406.    Based on the foregoing, Plaintiffs are entitled to a determination that the Defendants' corporate existence is a sham and that Defendants LBR Liquidating Trust, David M. Dunn, Limetree Bay Terminals, Limetree Bay Ventures, Limetree Bay Holdings, Arclight and Freepoint are each directly liable to Plaintiffs for the harms that occurred as a result of their purchase, undercapitalization, restart, operation and ownership of the Refinery.

## **PUNITIVE DAMAGES**

407.   Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

408.   From Defendants' acquisition of the Limetree Bay Facility to Defendants' formation and operation of the Facility, Defendants knew and understood at all times the high risk that oil and other chemicals, toxins, and particulates could contaminate nearby neighborhoods and cause residents' significant personal injuries and property damage.

409.   Although Defendants knew that the operation of the Limetree Bay Facility was unsafe, as evidenced by four environmental disasters in four months, including one occurring less than four days after the reopening of the Refinery, and despite communication from the government and residents of these concerns, Defendants continued to operate the Refinery to serve Defendants' own profit motives.

410.   Defendants continued Refinery operations after the first, second, third, and fourth toxic events. After each event, Defendants had the opportunity to comprehensively evaluate the safety of continued Refinery operations. Despite the clear warnings that the facility was not safe, and should not be operated, Defendants refused to close or limit operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* toxic incidents.

411.   Defendants continuously failed to appropriately warn the public and publicly minimized serious chemical releases that endangered the health of Plaintiffs and the Class.

412.   Defendants pursued this course of conduct intentionally, recklessly, and with an evil motive or, at minimum, a reckless indifference to the injuries and damages that could be caused, meriting an award of punitive damages in an amount to be proven at trial.

## INJUNCTION TO SUPPLY WATER

413.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

414.    The water supply on St. Croix is limited and many people rely on cisterns at their homes or businesses to collect and access safe, clean, potable water for drinking and other uses such as bathing and cooking.

415.    The actions of Defendants, or entities for which Defendants are responsible, contaminated with toxins and contaminants the roofs, gutters, and pipes that collect water for the cisterns, as well as the cisterns and other sources supplying water to the residents of St. Croix, including Plaintiffs and Class members.

416.    Despite almost two years having passed since the toxic discharges, Defendants and the entities for which they are responsible, have made little or no effort to clean the roofs, gutters, pipes, and cisterns at issue, and to clean and seal the cisterns or take other actions to remedy the effects of the toxic discharges.

417.    Plaintiffs and the Class are still without adequate supply of clean, safe, and potable water, as a direct and proximate cause of Defendants' actions.

418.    In light of the harm caused by Defendants to the water supply in St. Croix, supposedly as a temporary solution, Limetree Bay Refining, LLC and Defendant Limetree Terminals, agreed, in the Limetree Bay Refining Bankruptcy, to supply clean, safe, potable water to the residents of St. Croix pursuant to a stipulation that was agreed upon by Defendants and Plaintiffs.

419.    Defendants have now breached that stipulated agreement, have failed to open distribution centers on numerous occasions, have decreased the amount of water from the agreed

amount, and have shortened the agreed hours of distribution drastically, thus impairing the ability of Plaintiffs and the Class to have clean, safe, potable water.

420.    Plaintiffs are concerned that, as a result of their litigation of this suit in the U.S. District Court for the District of the Virgin Islands, Defendants will further revoke or materially limit the supply of clean, safe, potable water to the residents of St. Croix pursuant to that stipulation.

421.    Safe, clean, potable water is essential to human health and unless Defendants are enjoined by this Court to systematically go into each neighborhood affected and clean the roofs, piping and drains and clean, thoroughly seal and refill the affected cisterns, the Plaintiffs will never actually have potable water.  Even with bottled water, persons are still having to bath in, cook with, and brush their teeth with contaminated water. Moreover, such interim solutions are inadequate. Until a meaningful clean-up is performed, the residents of St. Croix, Plaintiffs and the Class will be irreparably harmed by Defendants' contamination of the only means that many citizens have to obtain potable water on a consistent basis in St. Croix.

422.    Further, the process of continuously having to drive to a location and wait in line every other day for a meager amount of water cannot continue and the underlying cause of the Plaintiffs' and other Class members' inability to have potable water must be remedied expeditiously by providing the funds to do so.

423.    Because Plaintiffs and Class Members are predominantly low-income residents of St. Croix, the imposition of the bond requirement set forth by Federal Rule of Civil Procedure 65(c) would impose undue hardship on them, and such requirement should therefore be waived in accordance with the Rule.

## VII.    RELIEF REQUESTED

424. Plaintiffs, individually and on behalf of the Class, hereby seek the following relief:

a.) An order naming Plaintiffs' counsel as lead counsel and executive committee members for this matter and any other related or consolidated matters, as set forth in Plaintiffs' forthcoming Motion to Appoint Interim Lead Counsel and Executive Committee Members Pursuant to Fed. R. Civ. P. 23 (g), to be filed in this matter;

b.) An order selecting certain of the Plaintiffs as Lead Plaintiffs for this matter and any other related or consolidated matters;

c.) Damages;

d.) Medical monitoring for Plaintiffs and Medical Monitoring Class;

e.) Response costs pursuant to 42 U.S.C. § 9607(a);

f.) Punitive damages where allowable;

g.) Pre- and post-judgment interest as allowed by law;

h.) Injunctive relief requiring Defendants to supply clean, safe potable water to Plaintiffs and the Class on an interim basis while they provide for the systematic cleaning of the affected roofs, piping, and drains and clean and thoroughly seal the cisterns and refill them with water or to provide the funds to do such cleaning to rectify the inability of Plaintiffs and the Class to have potable water at their residences and businesses, and to otherwise remediate all of the pollution and contamination caused by the Toxic Incidents as alleged herein;

i.) Declaratory judgment that Defendants are responsible for all past and future costs (including response costs under 42 U.S.C. § 9607) to remedy the harms caused to Plaintiffs and the Class, and their properties;

       j.)     Attorneys' fees and costs pursuant to all applicable statutes and/or regulations, including but not limited to 42 U.S.C. § 7604(d), 42 U.S.C. § 7607(f), 42 U.S.C. § 9607 and 5 V.I.C. § 541; and

       k.)     All other relief this Court deems necessary, just and proper.

## JURY TRIAL DEMAND

425.     Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: January 20, 2023             Respectfully submitted,

                               LEE J. ROHN AND ASSOCIATES, LLC

                                 _/s/ Lee J. Rohn_
                               Lee J. Rohn
                               Rhea R. Lawrence
                               Lee J. Rohn and Associates, LLC
                               1108 King Street, Suite 3 (mailing)
                               56 King Street, Third Floor (physical)
                               Christiansted, St. Croix
                               U.S. Virgin Islands 00820
                               Telephone: (340) 778-8855
                               lee@rohnlaw.com
                               rhea@rohnlaw.com

                               Shanon J. Carson
                               Dena Young
                               John Kerrigan
                               BERGER MONTAGUE PC
                               1818 Market Street, Suite 3600
                               Philadelphia, PA 19103
                               Telephone: (215) 875-3000
                               scarson@bm.net
                               dyoung@bm.net
                               jkerrigan@bm.net

                               Warren T. Burns, Esq.
                               Martin D. Barrie, Esq. (*pro hac vice forthcoming*)
                               BURNS CHAREST LLP
                               900 Jackson Street, Suite 500
                               Dallas, Texas 75202

Telephone: (469) 904-4550
wburns@burnscharest.com
mbarrie@burnscharest.com

Korey A. Nelson, Esq.
H. Rick Yelton, Esq.
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
knelson@burnscharest.com
ryelton@burnscharest.com

Timothy W. Burns, (*pro hac vice
forthcoming*)
BURNS BAIR LLP
10 E. Doty Street, Suite 600
Madison, Wisconsin 53703
Telephone: (608) 286-2302
tburns@burnsbair.com

Vincent Colianni, II, Esq.
Vincent A. Colianni, Esq.
Marina Leonard, Esq.
COLIANNI & COLIANNI
2120 Company Street
Christiansted, VI 00820
Telephone: (340) 719-1766
mailbox@colianni.com
vinny@colianni.com
vince@colianni.com
marina@colianni.com

C. Jacob Gower, Esq.
GOWER LEGAL LLC
1919 Pine Street
New Orleans, LA 70118
(337) 298-9734
jacob@gowerlegal.com

*Attorneys for Plaintiffs*