| | |
|---|---|
| BEECHER COTTON, PAMELA COLON, SIRDINA ISAAC-JOSEPH, ESTHER CLIFFORD, SYLVIA BROWNE, ALVINA JEAN-MARIE ILARRAZA, RYAN ALLEYNE, AGNES AUGUSTUS, and CESARINA MIRANDA, individually and on behalf of all others similarly situated,<br><br>                  **Plaintiffs,**<br>   v.<br>LIMETREE BAY VENTURES, LLC, ET. AL.<br><br>           **Defendants.** | Case No. 1:21-cv-00261-WAL-EAH<br><br>**ACTION FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><u>JURY TRIAL DEMANDED</u> |

**MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs and Class Members seek a temporary restraining order and preliminary injunction ordering the Injunction Defendants to provide Plaintiffs and Class Members with safe, clean, and potable water, and to immediately remediate, at a minimum, the roofs, pipes, and cisterns that are contaminated with constituents emitted by the Injunction Defendants. Plaintiffs have a likelihood of success on the merits of their negligence *per se*, common law trespass and statutory private nuisance claims under 28 V.I.C. § 133. An Order requiring the Injunction Defendants to supply Plaintiffs and Class Members with safe, clean, and potable water, and to remediate the contaminated roofs, pipes, and cisterns, will prevent Plaintiffs from suffering irreparable harm and will not cause any material harm to the Injunction Defendants, who are undoubtedly the source of the contaminated water supply and who have the resources to provide life-sustaining water to Plaintiffs and Class Members.

## I.  Factual Background

As alleged in the operative Complaints filed in the Litigation, certain Defendants reopened in February 2021 an integrated petroleum refinery and marine loading terminal located on the south-central coast of St. Croix that had been shuttered since 2012. The reopened facility was jointly owned and operated

by Limetree Bay Refining, LLC, predecessor-in-interest to defendants LBR Liquidating Trust and David M. Dunn, and Limetree Terminals, LLC (collectively, Limetree Bay Refining and Limetree Bay Terminals are referred to as "Limetree"). Collectively, the operative Complaints allege that in order to cut corners and gain profits, Limetree was severely undercapitalized, and that Limetree was indeed controlled, managed, and operated by certain other well-capitalized Defendants.[1]

Prior to its 2012 shuttering, the facility, under its prior ownership, was the cause of multiple environmental issues.[2] Despite this history, Limetree, without adequate pre-opening employees, maintenance, and procedures in place, restarted operations. As an example, only a single Health, Safety, and Environmental ("HSE") department served both the refinery and terminal facilities and staffed that HSE department with only five employees.[3] A refinery of the "size and complexity" of the Limetree facility would normally be expected to have at least ten and up to twenty full-time HSE employees alone, according to the U.S. Environmental Protection Agency (the "EPA").[4] Limetree's failure to staff this shared HSE department appropriately contributed in short order, along with other reopening failures and shortcomings, to multiple contamination events at the facility.[5]

### a. The multiple pollution events.

On February 4, 2021, just three days after the facility restarted operations, Flare #8 at the refinery experienced a flaring event causing emissions from the flare in the form of "a mixture of oil and water, in the form of an oil mist" that included "liquid droplets of oil" and other heavy organic compounds.[6] This flare rainout contaminated, among other things, the roofs, pipes, and cistern systems that are the primary sources of water that St. Croix residents, including Plaintiffs, use for drinking, bathing, washing dishes, brushing teeth, feeding livestock, and watering crops and other vegetation.[7] Importantly, Limetree "was aware of the

---

[1] *See, e.g.*, First Amended Class Action Complaint filed in *Cotton*, No. 1:21-cv-00261 (D.V.I.), ECF No. 143 ("*Cotton* Am. Cm.") at ¶¶ 2, 43-45, 68-70, 74-76, 289.
[2] *See, e.g.*, *U.S. v. Hovensa, LLC*, No. 1:11-cv-06 (D.V.I. 2011).
[3] *See* Exhibit 1, Statement of Authority, U.S. Environmental Protection Agency, at ¶ 91 (CAA-02-2021-1003, May 14, 2021) ("May 14 Order").
[4] *Id.* at ¶ 92.
[5] *Cotton* Am. Cm. at ¶¶ 85-86, 89-145, 242-244.
[6] Exhibit 1, May 14 Order at ¶¶ 34, 108; *Cotton* Am. Cm. at ¶¶ 90-91.
[7] Exhibit 1, May 14 Order at ¶¶ 36-43; *Cotton* Am. Cm. at ¶¶ 92-93, 160.

impact this event had on the surrounding community, and paid for various cleaning and decontamination work and provided bottled water to the community."[8]

The February incident was just the beginning of the environmental disaster caused by Defendants. In April 2021, for five consecutive days, Flare #8 malfunctioned again, resulting in hydrogen sulfide emissions that were orders of magnitude higher than the flare's permitted limits.[9] The EPA determined that the April incident resulted in concentrations of sulfur dioxide exceeding the Acute Exposure Guideline Level 1 for S at ground level – meaning that individuals exposed to these emissions were "faced with imminent and substantial danger to their health."[10] In addition to this sulfur dioxide release, the EPA confirmed the presence of "emissions plumes,"[11] which makes it highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water.[12] Less than a month later, on May 5 and May 7, 2021, Limetree environmental personnel acknowledged to the EPA that Flare #8 had once again exceeded its hydrogen sulfide emissions limit.[13] Because of the visible plume, it is highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water.[14] These droplets then fell to the ground, contaminating Plaintiffs' and Class Members' residences, property, and water systems (including roofs, pipes, and cisterns).

Then, on May 12, 2021, yet another flaring incident occurred at the refinery, resulting in a "large trailing plume of visible emissions" from Flare #8, as depicted below.[15]

---

[8] Exhibit 1, May 14 Order at ¶ 37. While the EPA represents that Limetree paid for various cleaning and contamination work, Plaintiffs are unaware specifically of what work Limetree actually funded and in any event, Limetree did not complete cleaning or contamination remediation work on Plaintiffs' roofs, pipes, cisterns, or property.
[9] *Id.* at ¶ 49; *Cotton* Am. Cm. at ¶¶ 109-115.
[10] Exhibit 1, May 14 Order at ¶ 68.
[11] *Id.* at ¶ 62.
[12] *Cotton* Am. Cm. at ¶ 117.
[13] Exhibit 1, May 14 Order at ¶¶ 69-78; *Cotton* Am. Cm. at ¶¶ 130-134.
[14] *Id.* at ¶ 135.
[15] Exhibit 1, May 14 Order at ¶ 79-80; *Cotton* Am. Cm. at ¶¶ 137-139.



This incident once again caused flare rainout, spewing "liquid droplets of oil" and other hazardous substances and air pollutants into the St. Croix community.[16] Once again, Limetree acknowledged that residents' cistern water was contaminated by this event and promised to establish water distribution for affected communities.[17]

The Injunction Defendants continued their operations after each of the first, second, third, *and fourth* incidents. Rather than comprehensively evaluate the safety of continued operations, and in the fact of information that continued operation from the facility was not safe, the Injunction Defendants refused to close or limit operations, choosing instead to serve their own profit motives. But after this fourth event, the EPA intervened and shut down Limetree's operations.

### b. Testing shows conclusively that Limetree contaminated Plaintiffs' cisterns.

To determine the potential impact zone of the various releases, Plaintiffs' experts first performed air modeling to establish the zone of impact. This modeling included a review of weather data, topography information for the Flare #8 point of release, and geographic characteristics of the island.[18] This modeling confirmed that the impact zone was composed of much of the western side of St. Croix. The figure below depicts the likely zone of impact, with the caveat that the magenta lines, representing the extent of the zone of impact from the April and May releases, is truncated at a 10-kilometer limit due to model limitations.[19] The

---

[16] Exhibit 1, May 14 Order at ¶ 79; *Cotton* Am. Cm. at ¶ 138.
[17] Exhibit 1, May 14 Order at ¶ 86; *Cotton* Am. Cm. at ¶¶ 141-145.
[18] Exhibit 2, Affidavit of Dr. Erno Sajo at ¶ B.
[19] Exhibit 2, Affidavit of Dr. Erno Sajo at ¶ B(2), B(4).

true impact zone extends much further west of the aerosol model magenta line due to the lack of data concerning the volume of the release(s):



Plaintiffs' experts next performed fingerprinting and forensic analyses of petroleum hydrocarbons to confirm that surface and cistern contamination was caused by the emissions from the Limetree facility. Samples were collected from surfaces, drinking water, and visible petroleum sheens on domestic drinking water supply cisterns using EPA-approved methods.[20] Soil samples were taken both east and west of the facility comparison purposes.[21] In all, eighty-six (86) samples were collected and tested for polycyclic aromatic hydrocarbons ("PAH"), petroleum hydrocarbons, tertiary biomarkers, and metals.[22]

The test results show conclusively that contaminants from the 2021 emissions events are present in Plaintiffs' soil, surfaces, and water. The yellow and red properties pinpointed below represent contaminated properties and cisterns, and the locations of those pinpoints correspond to the same area that air modeling determined was the zone of impact from the releases:



---

[20] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 26.
[21] Exhibit 3, Affidavit of Marco Kaltofen at ¶¶ 13, 14, 36.
[22] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 34.

Source soil samples taken west of the refinery were heavily contaminated with PAHs, as compared with background site samples east of the refinery that contained no detectable PAHs.[23] The U.S. Dept. of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ASTDR") notes that PAHs "may reasonably be expected to cause cancer."[24] PAHs are also a type of Polycyclic Organic Matter.[25] Polycyclic Organic Matter constitute "hazardous air pollutants" ("HAPs") under the Clean Air Act and "hazardous substances" under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). 40 U.S.C. § 7412; 42 U.S.C. 9601(14); 42 C.F.R. 302.4, Table.

Similarly, surface samples west of the refinery were heavily contaminated with diesel-range petroleum hydrocarbons while samples east of the refinery contained no detectable amounts of these constituents.[26] Petroleum hydrocarbons, including particularly benzo-perylenes, which were present in the samples taken west of the refinery, are also carcinogenic to humans.[27] Benzo-perylene also is an EPA-listed hazardous substance under CERCLA. *See* 42 C.F.R. 302.4, Table.

Samples of cistern water taken west of the refinery were contaminated with oil-range petroleum hydrocarbons that have a much higher carbon number than gasoline or diesel fuels.[28] The hydrocarbons detected are a primary match to the chemicals released by the emissions, rather than to petroleum contaminants that are common to development areas.[29] A toxin-contaminated cistern with a visible oil sheen is shown below:

---

[23] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 34.

[24] *ToxFAQs^{TM} for Polycyclic Aromatic Hydrocarbons (PAHs)*, ASDTR, https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=121&toxid=25; Exhibit 3, Affidavit of Marco Kaltofen at ¶ 17.

[25] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 34.

[26] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 17.

[27] *ToxFAQs^{TM} for Total Petroleum Hydrocarbons (TPH)*, ASDTR, https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=423&toxid=75; Exhibit 3, Affidavit of Marco Kaltofen.

[28] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 40.

[29] Exhibit 3, Affidavit of Marco Kaltofen at ¶ 40.



The extensive pollution and contamination caused by Defendants will require comprehensive cleaning to rehabilitate. Because the concrete the cisterns are composed of is porous, petroleum can infiltrate those cracks rendering pressure washing alone insufficient. Instead, those cracks must be sealed after any pressure-washing and steam cleaning are necessary to prevent any further hydrocarbon leaching. To date, Limetree has not completed such remediation for Plaintiff and Class Members, and thousands of cisterns remain polluted.

      **c.   Continuation of the water program and remediation of the contaminated properties are both possible and essential.**

As a result of the contamination confirmed by Plaintiffs' experts, the affected residents of St. Croix are witnessing in real time a Camp Lejeune-like situation unfold: their only source of water is contaminated with constituents that are known to cause health hazards. To avoid a similar fate—generations of health problems and years of associated litigation—it is absolutely critical and urgent that the Injunction Defendants must act now to continue to provide clean drinking water to Plaintiffs and Class Members and also to remediate their roofs, pipes, and cisterns, as well as other affected real and personal property, though this Motion understandably prioritizes and focuses upon remediation of the Plaintiffs' and Class Members' water delivery systems.

Soon after the May 2021 incident, Limetree established a minimal program for distributing water to residents of St. Croix whose cisterns were contaminated by the multiple releases from the facility. Pursuant to a stipulation entered October 29, 2021 by the U.S. Bankruptcy Court for the Southern District of Texas, that was negotiated by the undersigned Plaintiffs' Counsel, the water program was significantly expanded to

include additional communities and additional distribution centers.[30] Soon after the sale of the refinery was approved, however, Defendants began to reduce the amounts of water available and the hours during which that water was distributed, culminating in a total cessation of the water program—without court order or approval—on October 8, 2022.

At an absolute minimum, the continuation of the negotiated water program is essential to the health and safety of the affected residents of St. Croix. Plaintiffs' and Class Members' cisterns remain contaminated such that they have no consistent source of clean water for drinking and other household uses. Until their cisterns are appropriately remediated, the water program is the only avenue to provide clean water to Plaintiffs and Class Members. Simultaneously, the Injunction Defendants must begin a comprehensive cleanup of the roofs, pipes, and cisterns (including resealing those cisterns, once cleaned) so that the water program can end, and Plaintiffs and Class Members can access clean, safe, potable water in their homes again, that they lost at absolutely no fault of their own. If remediation work does not commence, Plaintiffs and Class Members will have only two options for their daily, necessary household tasks such as drinking, bathing, cooking, and brushing their teeth. They will either be forced to complete these tasks using the expensive and inconvenient method of using bottled water, or they will be required to do so using contaminated water, effectively guaranteeing negative impacts to their health.

There is ample funding available to continue the water program as well as to complete the necessary remediation, for multiple reasons. First, LBR Liquidating Trust has assumed the right to claim coverage under the multiple insurance policies issued to Limetree Bay Refining, and those policies also provide coverage to defendant Limetree Bay Terminals.[31] Next, Defendant Dunn in his capacity as Liquidating Trustee has recently initiated eighteen adversary proceedings seeking to recover in excess of $9 million to the bankruptcy estate, some of which can and should be utilized upon its recovery to fund the water program.[32]

---

[30] Exhibit 4, Stipulation and Agreed Order Adopting Water Distribution Program, *Limetree Bay Refining, LLC v. Cotton*, No. 21-03791, R. Doc. 126 (Bankr. S.D. Tex. Oct. 29, 2021) ("Water Stipulation").

[31] Exhibit 5, Chapter 11 Plan of Liquidation at § 19(d).

[32] *See Dunn v. Alimak Grp. USA, Inc.*, No. 22-3277 (Bankr. S.D. Tex. 2022); *Dunn v. Ballard Hospitality, LLC*, No. 22-3278 (Bankr. S.D. Tex. 2022); *Dunn v. Ballard Hospitality-VI, LLC*, No. 22-3279 (Bankr. S.D. Tex. 2022); *Dunn v. CFL Consulting LLC*, No. 22-3280 (Bankr. S.D. Tex. 2022); *Dunn v. Chalmers & Kubeck, Inc.*, No. 22-3281 (Bankr. S.D. Tex. 2022); *Dunn v. Engineered Parts & Services, Inc.*, No. 22-3282 (Bankr. S.D. Tex. 2022); *Dunn v. Federal*

And finally, Terminals itself was never part of the bankruptcy and has long operated a substantial terminal facility; it unquestionably has sufficient resources to fund the provision of clean water to the residents of St. Croix. There are **hundreds of millions of dollars** available under those policies and those funds should be utilized, in part, to continue to fund the water program and immediately remediate the Plaintiffs' and Class Members' roofs, pipes, and cisterns.

## II. Procedural Background

Beginning on May 19, 2021, several class action lawsuits were brought against Limetree and other defendants on behalf of the people and entities who suffered injuries and damages (as well as those seeking medical monitoring), as a result of the pollution events. The undersigned Plaintiffs' Counsel collectively represent thousands of Class Members who have suffered damages and/or injuries as a result of the pollution events.

On July 12, 2021, certain Limetree entities filed a Chapter 11 Petition for Bankruptcy with the U.S. Bankruptcy Court for the Southern District of Texas. Case No. 4:21-BK-32351, ECF No. 1. Pursuant to section 362 of the Bankruptcy Code, the filing of the bankruptcy petition resulted in an automatic stay of the above-captioned class actions with respect to debtor entities who were defendants in the Litigation. ECF No. 48 in 21-cv-253, ECF No. 12 in 21-cv-259, ECF No. 31 in 21-cv-260, and ECF No. 82 in 21-cv-261. Further, on July 26, 2021, debtor Limetree Bay Refining LLC commenced an adversary action in the bankruptcy court, moving to extend the stay of the class actions with respect to non-debtor defendants. Case No. 21-03791, ECF No. 1 ("Adversary Proceeding"). On the same day, the Court in the Adversary Proceeding entered a temporary restraining order, extending the bankruptcy-related stay of the Litigation to the non-debtor defendants for fourteen (14) days. ECF No. 3, 21-03791. This stay was further extended on August 10,

---

*Express Corp.*, No. 22-3283 (Bankr. S.D. Tex. 2022); *Dunn v. Global Engagement Support Servs., LLC*, No. 22-3284 (Bankr. S.D. Tex. 2022); *Dunn v. H&K Engineering, LLC*, No. 22-3285 (Bankr. S.D. Tex. 2022); *Dunn v. John Crane Inc.*, No. 22-3286 (Bankr. S.D. Tex. 2022); *Dunn v. John Elardge Dugas, III*, No. 22-3287 (Bankr. S.D. Tex. 2022); *Dunn v. Pentair Filtration Solutions, LLC*, No. 22-3288 (Bankr. S.D. Tex. 2022); *Dunn v. RASD Consulting Grp. LP* No. 22-3289 (Bankr. S.D. Tex. 2022); *Dunn v. Rev1 Oil & Gas, LLC*, No. 22-3290 (Bankr. S.D. Tex. 2022); *Dunn v. Rockell Automation Puerto Rico, Inc.*, No. 22-3291 (Bankr. S.D. Tex. 2022); *Dunn v. Rotating Mach. Servs., Inc.*, No. 22-3292 (Bankr. S.D. Tex. 2022); *Dunn v. Three L., Inc.*, No. 22-3293 (Bankr. S.D. Tex. 2022); *Dunn v. Worley Pan-Am. Corp.*, No. 22-3294 (Bankr. S.D. Tex. 2022).

2021, when the Court in the Adversary Proceeding entered a Stipulated and Agreed Order to allow the parties to mediate certain exigent health and safety issues. ECF No. 56, 21-03791.

Mediation began on August 26, 2021, and continued over multiple sessions before the Hon. Marvin Isgur, U.S. Bankruptcy Judge. During the mediation, Plaintiffs sought in particular to address the urgent and critical needs of the Class Members for access to clean water for drinking, bathing, cooking, subsistence farming, and the health and safety of pets and livestock. Ultimately, the parties to the mediation negotiated and reached agreement on the Water Stipulation described above, which was entered by the Court in the Adversary Proceeding on October 29, 2021.[33] However, Defendants, after initially adhering to the Water Stipulation, began to fail to comply with the terms of the Stipulation, first reducing the amount of water available for distribution and the hours of distribution, before ultimately ending the water program altogether, despite ongoing severe contamination issues that are preventing St. Croix's affected residents from obtaining safe and clean water for drinking and other household uses.[34] Moreover, the parties were never, through mediation, able to resolve the issue of the necessity of cleaning homes and cisterns contaminated by the various releases, as well as remediating other real and personal property, for example, soil and crops.

Having attempted the mediation process for nearly a year and a half without obtaining a satisfactory resolution from Defendants, on September 26, 2022, Plaintiffs gave notice to Judge Isgur that the parties were at an impasse so that this litigation could continue. No. 21-cv-261, ECF No. 132-5, Exhibit 2. On the same date, Plaintiffs filed with this Court a Notice of Status of Bankruptcy and Notice to Lifting of the Bankruptcy Stay, requesting that the Court lift the stay of the Litigation and return the cases to the active docket. No. 21-cv-261, ECF No. 132.

For the balance of 2022, the Injunction Defendants refused to do the right thing by providing water to residents or commencing cleaning of cisterns. Instead, left to their own devices, they have simply ignored the situation and done nothing to remedy the dire situation they created.

In order to obtain a preliminary injunction, a party must establish "that (I) they are likely to succeed on the merits of their claims, (II) they are likely to suffer irreparable harm without relief, (III) the balance of harms favors them, and (III) relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017); *accord First Bancorp v. Christopher*, 2018 WL 3715711, at *7 (D.V.I. Aug. 2, 2018) (in granting plaintiffs' motion for preliminary injunction, explaining that well-established factors considered in determining whether a preliminary injunction should be granted are: "(1) a reasonable probability of success on the merits; (2) that the moving party will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." ) (Lewis, Wilma A., Chief Judge) (internal citations omitted). The standards for a temporary restraining order are the same as those for a preliminary injunction. *Friends of Coral Bay v. Reliance Housing Foundation, Inc.*, 2006 WL 4012200, at *1 (D.V.I. 2006) (*citing Bieros v. Nicola*, 857 F. Supp. 445, 446 (E. D. Pa. 1994)).

I.      **Plaintiffs are likely to succeed on the merits of their negligence *per se*, trespass and private nuisance claims.**

In *Barclays Bus. Credit, Inc. v. Four Winds Plaza P'ship*, 938 F. Supp. 304 (D.V.I. 1996) this Court held that:

> "Likelihood of success on the merits," such as movant must demonstrate in order to obtain [a] preliminary injunction, requires movant to demonstrate a reasonable probability of eventual success in litigation; it is not necessary that movant's right to final decision after trial be wholly without doubt, but movant must make [a] prima facie showing that there is reasonable probability that it will prevail on [the] merits.

*Id.* (quoting *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982) and *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975)).

a.      **Plaintiffs have established a *prima facie* showing that there is a reasonable probability they will prevail on the merits of their negligence *per se* claim.**

---

[33] *Cotton* Am. Cm. at ¶ 258.
[34] *Id.* at ¶¶ 259-261.

Courts in the U.S. Virgin Islands recognize negligence *per se* as a cause of action. *See Antilles School, Inc. v. Lembach*, 64 V.I. 400, 423 (V.I. 2016) (citations omitted). "A plaintiff suing for negligence *per se* relies on the doctrine that obviates the normal showings of the duty and breach-of-duty elements of an ordinary negligence claim by relying on the defendant's violation of a statute or other legally-binding regulation; that is, the plaintiff must demonstrate that the defendant had a duty to follow the law, failed to follow the law, and that such failure caused damages to the plaintiff as a person within the class intended to be protected by the statute or regulation." *Id.*

Here, Defendants had a duty to comply with numerous environmental statutes. First, Defendants had a duty to comply with, but breached the standard of conduct required by, the Air Pollution Control Act when they emitted air pollutants in violation of 12 V.I.C. §§ 208 and 217, which prohibit emissions of air contaminants and noxious and objectionable odors. The Air Pollution Control Act's "declaration of policy" indicates that it seeks "to promote health, safety and welfare" and to "prevent injury to human, plant and animal life, and property." 12 V.I.C. § 201.

Second, Defendants had a duty to comply with, but breached the standard of conduct required by, the federal Clean Air Act's National Emissions Standards for Hazardous Air Pollutants ("NESHAPs"). Specifically, 40 C.F.R. § 63.670 regulates flare control devices. These requirements create various operation limits for individual flares including but not limited to (a) smokeless design capacity (40 C.F.R. § 63.670(c)), (b) maximum flare tip velocity (*id.* at § 63.670(d)), and (c) combustion zone operating limits (*id.* at § 63.670(e)). The facility's Flare #8 was subject to these requirements.[35] Due to the nature of the "rain out" events from this flare, it is highly likely that these operating limits were exceeded.[36] The Flare was also subject to H2S input gas concentration limit specified in 40 C.F.R. § 63.103a(h) and the Refinery's Title V Operating Permit of 162 parts per million volume ("ppmv") determined hourly on a 3 hour rolling average basis.[37] EPA's Clean Air Act Complaint filed in this Court describes multiple violations of these

---

[35] *See* Complaint, *U.S. v. Limetree Bay Refining, LLC, et al.*, Civ. A. No. 1:21-cv-264, filed July 12, 2021 (Doc. #1), at ¶ 18 ("EPA Complaint.").
[36] *See* Exhibit 6, Affidavit of Philip V. Steed at ¶ 13.
[37] EPA Complaint, at ¶ 18.

requirements.[38] The various violations of the Clean Air Act by Defendants caused the four (4) toxic events that caused Plaintiffs' and Class Members' injuries. Plaintiffs fall into the class of persons intended to be protected by the Clean Air Act, which is intended "to promote the public health and welfare…." 42 U.S.C. 7401(b)(1).

Third, Defendants had a duty to comply with, but breached the standard of conduct required by, the Water Pollution Control Act. The Water Pollution Control Act's "declaration of policy" states that "pollution of the waters of the United States Virgin Islands constitutes a menace to public health and welfare, creates public nuisances, . . . , and impairs beneficial uses of water" and that it is "the public policy of the United States Virgin Islands to conserve the waters of the United States Virgin Islands and to protect, maintain and improve the quality thereof for public water supplies, . . ., and for domestic, recreational and other legitimate beneficial uses." 12 V.I.C. § 181.

Unless a person has a current permit to discharge, "the discharge of any pollutant into the waters of the United States Virgin Islands *or* the causing of pollution of the waters of the Virgin Islands, by any person, shall be unlawful." 12 V.I.C. § 185(a) (emphasis added). Here, Defendants "discharged" "pollutants" from a "point source" when Flare #8 emitted PAHs, oil, and other contaminants into the "Waters of the United States Virgin Islands." *See* 12 V.I.C. § 182(b), (f), (i), and (j). "Discharge" means the "addition of any pollutant to United States Virgin Islands waters from any point source." *Id.* at § 182(i). "Pollutants" include incinerator residue, chemical wastes, and industrial waste. *Id.* at § 182(b). PAHs, oil, and other contaminants emitted from Flare #8 meet this definition. Plaintiffs' cisterns and wells constitute "Waters of the United States Virgin Islands," which include "private," "artificial" "accumulations of water." *See id.* at § 182(f). And Defendants' flare constituted a point source because it was a "discernible, confined and discrete conveyance" or "conduit" from which pollutants were discharged. *Id.* at 182(j).

The emissions of contaminants from the Refinery during the four (4) toxic incidents also caused "pollution," which is defined to include "contamination, or other alteration of the physical [or] chemical . . . properties, of any waters of the United States Virgin Islands, including change in . . . taste, color, . . . or odor

---

[38] *Id.* at ¶¶ 54-55; *see generally id.* at ¶¶ 26-53 (describing the four toxic incidents and some of the causes).

of the waters, or such discharge of any liquid, gaseous, solid, . . . or other substance into any waters as will or is likely to create a nuisance or render such waters harmful, detrimental, or injurious to public health, safety or welfare…." 12 V.I.C. § 182(a). Here, there is no doubt that Defendants' unpermitted emissions from Flare #8 caused pollution of Plaintiffs' roofs, pipes, and cisterns in violation of the Act.

Fourth, Defendants breached the standard of conduct under CERCLA when they released hazardous substances into the environment without or in violation of a permit. Defendants are liable for and breached the standard of conduct required by CERCLA § 107, 42 U.S.C. § 9607, when they released hazardous substances, including H2S (a listed hazardous substance pursuant to 40 C.F.R. § 302.4, Table), polynuclear aromatic hydrocarbons (same), polycyclic organic matter (same), including naphthalene (same), and waste oils into the environment. CERCLA was enacted to ensure "'those responsible for problems caused by the disposal of chemical poisons [must] bear the costs and responsibility for remedying the harmful conditions they created.'" *U.S. v. E.I. Dupont De Nemours and Co. Inc.*, 432 F.3d 161, 164 (3d Cir. 2005) (quoting *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 206 (3d Cir. 2003)) (citation omitted).

Based on Defendants' multitude of violations of Virgin Islands and federal environmental statutes that are designed to protect people like the Plaintiffs from Defendants' polluting activities and pollution, Defendants have breached their duty of care to Plaintiffs and injured them by polluting their drinking water.

b. **Plaintiffs have established a *prima face* showing that there is a reasonable probability they will prevail on the merits of their statutory private nuisance claim.**

The Virgin Island Code recognizes a private cause of action against one who causes damages to another by private nuisance. *See* 28 V.I.C. § 331;[39] *World Fresh Market, LLC v. Jolly*, 2022 VI SUPER 75U, ¶ 19, 2022 WL 4076876, at *4 (V.I. Super. Sept. 1, 2022); *Cifre v. Daas Enterprises, Inc.,* 62 V.I. 338, 359

---

[39] 28 V.I.C. § 331 provides that "Any person whose property is affected by a private nuisance, or whose personal enjoyment thereof is in like manner thereby affected, may maintain an action for damages therefor. If judgment is given for the plaintiff in such action, he may, in addition to the execution to enforce the same, on motion, have an order allowing a warrant to issue to the marshal to abate such nuisance. Such motion shall be made at the term at which judgment is given, and shall be allowed of course, unless it appears on the hearing that the nuisance has ceased, or that such remedy is inadequate to abate or prevent the continuance of the nuisance in which latter case the plaintiff may proceed to have the defendant enjoined." *See* 28 V.I.C. § 331 "Private nuisance; damages; warrant to abate; injunction".

(V.I. Super. 2015); *Bell v. Radcliffe*, 2015 WL 5773561, at *9 (V.I. Super. Apr. 30, 2015); and *Bermudez v. Virgin Islands Telephone Corp.*, 54 V.I. 174, 182, (V.I. Super. 2011).

With respect to private nuisance, the statutory provision authorizing private nuisance actions, 28 V.I.C. § 331, provides in part that "any person whose property is affected by a private nuisance, or whose personal enjoyment thereof is in like manner thereby affected, may maintain an action for damages therefor." *Jolly*, 2022 VI SUPER 75U, ¶ 19, 2022 WL 4076876, at *4 (*citing Bell,* 2015 WL 5773561, at *9); and *Bermudez*, 54 V.I. at 182, 185 (V.I. statute, 28 V.I.C. § 331, provides "the basis for private nuisance actions in the U.S. Virgin Islands. … Here the plain language of Section 331 is unambiguous: private nuisances are actionable by statute. One's property, or enjoyment of property, must be affected. Both damages and injunctive relief are available.").

A private nuisance has been described by Virgin Islands courts as being "an unreasonable interference with another's use and enjoyment of land." *Boyd v. Latalladi*, 8 V.I. 173, 177, 180 n. 2 (V.I. Mun. 1971) (*citing* Restatement (First) of Torts § 822 (Oct. 2022 Update),[40] or as "an 'invasion of another's interest in the private use and enjoyment of land.'" *Bermudez*, 54 V.I. at 193 (*quoting Restatements (Second) of Torts § 821D (1977).*[41]

There is no dispute here that the facts established in Section I.a-b above demonstrate that Defendants caused "an unreasonable interference with the use and enjoyment of the plaintiffs' property."

**c. Plaintiffs have established a *prima face* showing that there is a reasonable probability they will prevail on the merits of their common law trespass claim.**

The Superior Court of the Virgin Islands in *Alleyne v. Diageo USVI, Inc.*, 63 V.I. 384, 417–18, 2015 WL 5511688, at *16 (V.I. Super. 2015), after conducting a *Banks* analysis, adopted the formulation of the tort of negligent trespass as formulated in Section 165 of the Restatement (Second) of Torts as the soundest rule

---

[40] *Accord Alleyne v. Diageo USVI, Inc.*, 63 V.I. 384, 405 (V.I. Super. 2015) ("Specifically, the Court will define private nuisance as "a substantial, unreasonable, interference with another's interest in the private use and enjoyment of their property."); and *Cifre*, 62 V.I. 338, 359–61, 2015 WL 1912709, at *11 ("The Virgin Islands' private nuisance statute was patterned after a similar statutory provision enacted in Alaska. Interpreting its own private nuisance statute, Alaska defines a private nuisance as 'a substantial and unreasonable interference with the use and enjoyment of real property....' Interference must be both substantial and unreasonable before a cause of action for private nuisance will lie, and the action giving rise to the claim may be intentional, negligent, reckless, or ultrahazardous.") (internal footnotes and citations omitted).

for the Virgin Islands. "Section 165 of the Restatement explains this cause of action as follows: One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest. Restatement (Second) of Torts Sec. 165 (1965)." *Alleyne*, 63 V.I. at 417. Under this formulation of negligent trespass, "Plaintiffs must allege that Defendants (1) recklessly, negligently, or as a result of an abnormally dangerous activity; (2) entered or caused a thing or third person to enter land of another; and (3) harm caused by his presence or the presence of the thing or the third person upon the land." *Alleyne*, 63 V.I. at 418.

There is no dispute here that the facts established in Section I.a-b above demonstrate that the Injunction Defendants negligently trespassed on the land of Plaintiffs.

## II. Plaintiffs will suffer irreparable harm without injunctive relief.

Irreparable harm is harm for which "money damages would be inadequate." *See Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 Fed. App'x 550, 554-55 (3d Cir. 2003) (*quoting BP Chemicals Ltd. V. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir. 2000)); *see also PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) (A party shows irreparable harm if its loss is "one which cannot be fully compensated by an award of money damages."); *Equivest St. Thomas, Inc. v. Government of Virgin Islands*, 208 F.Supp.2d 545, 551 (D.V.I. 2002) (plaintiff establishes irreparable harm where money damages would be inadequate remedy).

Environmental harm such as the sort inflicted by Defendants on Plaintiffs and Class Members here is considered irreparable injury. "The Supreme Court has stated: 'Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.'" *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 2 F.3d 493, 506 (3d Cir. 1993) (*quoting Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987)); *see also SBRMCOA, LLC v. Beachside Associates, LLC*, 2015 WL 5168350, at *4 n. 24 (V.I. Super.

---

[41] *Accord Jolly*, 2022 VI SUPER 75U, ¶ 19, 2022 WL 4076876, at *4.

Sept. 1, 2015) (granting a preliminary injunction after finding the plaintiff had shown irreparable injury based on the threatened environmental and health concerns due to the release of wastewater effluent which would expose residents to diseases such as dysentery and cholera); *Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1162-1164, 1177 (D. Wyo. 1998) (granting a preliminary injunction after finding if an injunction did not issue that there was a substantial likelihood that the plaintiffs would suffer irreparable harm from groundwater contaminated from discharges and releases during operation of petroleum products refinery/tank farm, where off-site contamination will persist unabated, risk of contamination, both on and in the soils, will remain undefined and not quantified, and harm posed by these risks cannot be remedied by award of monetary damages, but only by proactive measures directed towards defining and controlling contamination both on and off the site). The potential harm that Plaintiffs and Class Members will suffer if the Injunction Defendants do not continue to supply clean, safe, and potable water, and do not immediately remediate the roofs, pipes, and cisterns at issue, is harm that cannot be adequately compensated by money damages.

Water is necessary to life. It is beyond dispute that the affected St. Croix's residents, the vast majority of whom are poor and constitute minority groups that live around the oil facility,[42], like all other people, need daily access to a source of safe drinking water, and the presence of oil and other chemicals, toxins, and particulates in drinking water can cause serious health problems. To be sure, courts have recognized in the context of an injunctive relief analysis that the drinkability of water or a continuous supply of drinking water against a wave of contamination constitutes irreparable injury. *See, e.g.*, *Concerned Pastors for Social Action v. Khouri*, 217 F. Supp. 3d 960, 970-973, 979-980 (E.D. Mich. 2016) (questionable availability of safe drinking water constituted irreparable harm since "[i]t is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap"). As these courts have recognized, the types of harm that grow from a lack of clean water are so grievous, and so urgent, that money damages cannot right this wrong.[43] The irreparable harm factor clearly favors the issuance of an injunction.

---

[42] *Cotton* Am. Cm. at ¶¶ 269-271.
[43] Plaintiffs do assert claims for money damages that are not the subject of this motion but that are expressly preserved in their Complaints and will be adjudicated after this case proceeds through discovery to a jury trial.

**III.    The threatened injury to Plaintiffs if the injunction is not granted outweighs any potential harm to Defendants that would result from the injunction.**

If the balance of hardship favors the plaintiff when weighing the potential harm that will result to Defendants from the grant of an injunction against the harm that Plaintiffs will incur in the absence of an injunction, preliminary relief should be granted. Here, any harm that Defendants might suffer from an injunction ordering them to continue to provide clean water to Plaintiffs and to immediately commence remediating their roofs, pipes, and cisterns, is far outweighed by the harm that Plaintiffs will suffer in the absence of clean water. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596-97 (3d Cir. 2002); *Issa v. School District of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017); *Peoplestrategy, Inc. v. Lively Employer Services, Inc.*, 2020 WL 7869214, at *9 (D.N.J. Aug. 28, 2020).

When balancing hardships between the parties, any injury a defendant may suffer is discounted by the fact that the injury is self-imposed in that the defendant brought that injury upon itself. *See Sidewinder Films, LLC v. Sidewinder Films, LLC*, 2022 WL 6964829, at *6 (D.N.J. Oct. 11, 2022) (*citing Novartis Consumer Health,* 290 F.3d at 596); *see also Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004) ("But, when the potential harm to each party is weighed, a party 'can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself.'") (quoting *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990)); *Republican National Committee v. Canegata*, 2022 WL 3226624, at *8 (D.V.I. Aug. 10, 2022). Here, any harm that Defendants may suffer from an injunction ordering them to provide clean water to Plaintiffs and remove the oil from Plaintiffs' properties and cisterns is a self-imposed injury. And any harm is far outweighed by the harm that Plaintiffs will suffer in the absence of clean and safe water.

Water is "undoubtedly the most important nutrient and the only one whose absence will be lethal within days." Barry M. Popkin, Kristen E. D'Anci, & Irwin H. Rosenberg, *Water, Hydration and Health*, Nutrition Reviews, Aug. 1, 2010, at 439. Conversely, the only possible harm that Defendants could cite is monetary, in the form of costs to continue the water program and commence remediation, and even that harm

is unlikely considering the vast amounts of insurance proceeds that are available – and indeed intended – to pay for these requested measures.

Defendants cannot establish a legitimate hardship by citing economic harms caused by enjoining their illegal activity. *Friends of Coral Bay v. Reliance Housing Foundation, Inc.*, 2007-20, 2006 WL 4012200, at *3 (D.V.I. Jan. 26, 2006) (citing U*nisource Worldwide, Inc. v. S. Sent. Al. Supply LLC*, 199 F.Supp.2d 1194, 1214 (M.D. Ala. 2001)). In *Friends of Coral Bay*, the U.S. District Court of the Virgin Islands determined that an estimated economic hardship of more than $30,000,000 was insufficient to tip the balance in the defendant's favor when the conduct plaintiffs sought to restrain was Clean Water Act violations increasing the discharge of water pollutants into Coral Bay. *Id.* This factor therefore also weighs heavily in favor of an injunction for the Plaintiffs.

In the balancing of harms between irreparable environmental injury on the one hand and economic harm on the other, "'the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Environmental Protection Information Center v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (*quoting Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987)); *see also Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*, 528 F.Supp.2d 625, 631 (S.D. W.Va. 2007) ("Damage to the environment is a strong consideration in balancing the harms for an injunction. In fact, because damage to the environment is often irreversible, this harm is frequently justification for a restraining order or an injunction."); *see Cascadia Wildlands v. U.S. Forest Service*, 2021 WL 6112546, at *7 (D. Or. Dec. 27, 2021); and *U.S. v. Righter*, 2010 WL 4977046, at *5 (M.D. Pa. Dec. 2, 2010). This factor therefore also weighs in favor of an injunction for the Plaintiffs.

### IV.     An injunction is in the public interest.

The public interest factor of the injunction analysis "requires the court to look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *McCahon v. Penn. Turnpike Comm'n*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). Courts therefore focus on "tangible effects on third parties" for this analysis, rather than the effects on the parties to the litigation. *Stilp v. Contino*, 629 F. Supp. 2d 449, 467 (M.D. Pa. 2009). And where the legislature has announced a strong

public policy that an injunction would promote, the "public interest factor weighs heavily in favor of the issuance of a preliminary injunction." *Oxford House, Inc. v. Twp. Of Cherry Hill*, 799 F. Supp. 450, 465 (D.N.J. 1992).

There can be no dispute that "the public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental." *U.S. v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). Additionally, an injunction here would promote the Virgin Islands legislature's public policy "to promote health, safety and welfare" and "to prevent injury to human, plant and animal life, and property." 12 V.I.C. § 201 (Virgin Islands Air Pollution Act). There are also no negative effects on third parties that would result from Defendants supplying Plaintiffs and Class Members with safe, clean, and potable water. The public interest factor weighs in favor of an injunction.

## V. The Court should waive the security requirement.

Federal Rule of Civil Procedure 65(c) typically requires that an applicant give some security to cover costs and damages if a party is found wrongfully enjoined or restrained. But this requirement may be waived if, after a consideration of "the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant," the court finds the equities weigh in favor of dispensing with the bond requirement. *See, e.g.*, *Temple Univ. v. White*, 941 F. 2d 201, 219-20 (3d. Cir. 1991) (internal citation omitted).

Defendants here are unlikely to suffer any loss because Plaintiffs and Class Members are likely to succeed on the merits. Defendants will suffer minimal monetary harm if they are ordered to supply Plaintiffs and Class Members with safe, clean, and potable water and to remediate their roofs, pipes, and cisterns. And anything more than a nominal bond would cause severe hardship to Plaintiffs and Class Members, who are predominantly low-income and minorities.[44] The equities here thus weigh in favor of waiving the security requirement. *See Temple; see also McCormack v. Twp. of Clinton*, 872 F. Supp. 1320, 1328 (D.N.J. 1994) (waiving security where the plaintiff was likely to succeed on the merits, the defendant would suffer no monetary harm, and anything more than a nominal bond would constitute a severe hardship to the plaintiff).

RESPECTFULLY SUBMITTED
LEE J. ROHN AND ASSOCIATES, LLC
Attorneys for Plaintiffs

DATED: January 25, 2023                    BY: _/s/ Lee J. Rohn_____
                                           Lee J. Rohn
                                           Rhea R. Lawrence
                                           Lee J. Rohn and Associates, LLC
                                           1108 King Street, Suite 3 (mailing)
                                           56 King Street, Third Floor (physical)
                                           Christiansted, St. Croix
                                           U.S. Virgin Islands 00820
                                           Telephone: (340) 778-8855
                                           lee@rohnlaw.com
                                           rhea@rohnlaw.com

                                           Shanon J. Carson, Esq.
                                           Dena Young
                                           John Kerrigan
                                           BERGER MONTAGUE PC
                                           1818 Market Street, Suite 3600
                                           Philadelphia, PA 19103
                                           Telephone: (215) 875-3000
                                           scarson@bm.net
                                           dyoung@bm.net
                                           jkerrigan@bm.net

                                           Warren T. Burns, Esq.
                                           BURNS CHAREST LLP
                                           900 Jackson Street, Suite 500
                                           Dallas, Texas 75202
                                           Telephone: (469) 904-4550
                                           wburns@burnscharest.com
                                           mbarrie@burnscharest.com

                                           Korey A. Nelson, Esq.
                                           H. Rick Yelton, Esq.
                                           BURNS CHAREST LLP
                                           365 Canal Street, Suite 1170
                                           New Orleans, LA 70130
                                           Telephone: (504) 799-2845
                                           knelson@burnscharest.com
                                           ryelton@burnscharest.com

---

[44] *Cotton* Am. Cm. at ¶¶ 269-271.

Vincent Colianni, II, Esq.
Vincent A. Colianni, Esq.
Marina Leonard, Esq.
COLIANNI & COLIANNI
2120 Company Street
Christiansted, VI 00820
Telephone: (340) 719-1766
mailbox@colianni.com
vinny@colianni.com
vince@colianni.com
marina@colianni.com

C. Jacob Gower, Esq.
GOWER LEGAL LLC
1919 Pine Street
New Orleans, LA 70118
(337) 298-9734
jacob@gowerlegal.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**THIS IS TO CERTIFY** that on January 25, 2023, I electronically filed the foregoing with the Clerk of the Court using the electronic filing system, which will send a notification of such filing to the following:

All counsel of record